TIMOTHY S. GOODMAN, PLAINTIFF IN ERROR, *v.* JOHN SIMONDS.

Where an accepted and endorsed bill of exchange was placed by the drawer as collateral security for his own debt in the hands of his creditor, and when the creditor came to sue the acceptor, the court instructed the jury, "that if such facts and circumstances were known to the plaintiff as caused him to suspect, or that would have caused one of ordinary prudence to suspect, that the drawer had no interest in the bill, and no authority to use the same for his own benefit, and by ordinary diligence he could have ascertained these facts," then the jury would find for the defendant—this instruction was erroneous.

The facts of the case examined, to ascertain whether or not there was sufficient evidence to go to the jury upon these points.

This court again says, that a *bona fide* holder of a negotiable instrument for a valuable consideration, without notice of facts which impeach its validity between the antecedent parties, if he takes it under an endorsement made before the same becomes due, holds the title unaffected by these facts, and may recover thereon, although as between the antecedent parties the transaction may be without any legal validity.

Where a party is in possession of a negotiable instrument, the presumption is that he holds it for value, and the burden of proof is upon him who disputes it; an exception being where the defect appears on the face of the instrument.

It is a question of fact for the jury, whether or not the holder had knowledge of defects existing antecedently to the transfer to him.

The English and American cases examined.

Surrendering collateral securities previously given, and affording increased indulgence as to time, furnish a sufficient consideration for the transfer of new collaterals.

THIS case was brought up, by writ of error, from the Circuit Court of the United States for the district of Missouri.

Goodman was a citizen of Ohio, and Simonds of Missouri.

The suit was brought by Goodman, upon the following bill of exchange:

EXCHANGE FOR $5,000.

CINCINNATI, O., *Sept.* 12, 1847.

Four months after date of this, my first of exchange, (second unpaid,) pay to the order of John Sigerson five thousand dollars, value received, and charge the same to account.

Your ob't serv't, WALLACE SIGERSON.

*Mr. John Simonds, St. Louis, Mo.*

Upon the face of the bill was written, "Accepted, John Simonds;" and endorsed upon the same was the following:

"Pay to T. S. Goodman & Co., or order; John Sigerson."
"Pay W. Nesbit & Co., or order; T. S. Goodman & Co."
"Pay Timothy S. Goodman. without recourse to W. Nesbit & Co."

Two of these parties, viz: John Sigerson and Simonds, lived in St. Louis, and the other two, viz: Goodman and Wallace Sigerson, in Cincinnati. The bill of exchange was sent from St. Louis to Wallace Sigerson, at Cincinnati, endorsed by John Sigerson, and accepted by Simonds, but without date, and without the signature of the drawer.

The narrative of the transactions which led to the possession of the bill by Goodman is given in the opinion of the court.

Upon the trial, there were several rulings of the court, but the one upon which the case came up to this court was the following, viz:

The defendant asked the court to give the following instruction to the jury:

"The defendant moves the court to instruct: If the jury find, from the evidence in the cause, that Wallace Sigerson never had any interest in the bill sued on, nor in the proceeds thereof, nor any authority to use the same for his own benefit, and did dispose of the same for his own benefit to T. S. Goodman & Co., and the plaintiff was at the time one of said firm, and when the bill was so transferred to said firm such facts and circumstances were known to the said Goodman as caused him to suspect, or that would have caused one of ordinary prudence to suspect, that said Wallace had no interest in the bill, and no authority to use the same for his own benefit."

To the giving of which by the court the plaintiff objected, and the court gave to the jury that instruction amended so as to read as follows:

Same instruction, as amended by the court:

"And by ordinary diligence he could have ascertained that said Wallace Sigerson had no interest in said bill, and no authority to use the same for his own benefit, then they will find for the defendant."

To the giving of which, as thus amended, the plaintiff objected, and excepted then and there to the giving of the same to the jury.

Under this instruction, the jury found a verdict for the defendant, and the plaintiff brought the case up to this court.

It was argued by *Mr. Pugh* for the plaintiff in error, and by *Mr. Geyer* for the defendant.

*Mr. Pugh* made the following points:

I. The title of a holder of negotiable paper, acquired before it was due, for valuable consideration, is not affected by the fraud of a prior party, in the absence of actual notice, without proof of bad faith on the part of the holder.

1. This was the original rule declared in England. (Miller *v.* Race, 1 Bur. R., 452; Price *v.* Neal, 3 Bur. R., 1355; S. C., 1 Blackstone, 390; Grant *v.* Vaughan, 3 Bur. R., 1516; S. C., 1 Blackstone, 485; Anonymous, 1 Ld. Raymond, 738; Peacock *v.* Rhodes, 2 Douglas, 633; Lawson *v.* Weston, 4 Espinasse, 56; Morris *v.* Lee, 2 Raymond, 1396; S. C., 1 Strange, 629.)

2. This rule was afterwards varied, and it was declared that the title of the holder of negotiable paper would not be protected, where it had been acquired under circumstances which ought to have excited the suspicions of a prudent and careful man. (Gill *v.* Cubitt, 3 Barn. and Cress., 466; Down *v.* Halling, 4 Barn. and Cress., 330; Snow *v.* Peacock, 2 Car. and Payne, 215; Beckwith *v.* Corral, 2 Car. and Payne, 261; Snow *v.* Leathem, 2 Car. and Payne, 314; Slater *v.* West, 3 Car. and Payne, 325; Strange *v.* Wigney, 6 Bing., 677.)

3. The rule was again modified, and it was held that the want of care, necessary to impeach the title of the holder of negotiable paper, must have been *gross*. (Crook *v.* Jadis, 5 Barn. and Adolphus, 909; Backhouse *v.* Harrison, 5 Barn. and Adolphus, 1098.)

4. Finally, the original rule was restored, and it was decided that his title would be good, unless the holder was guilty of *bad faith*. Lord Denman said, " We have shaken off the last remnant of the contrary doctrine." (Goodman *v.* Harvey, 4 Adolphus and Ellis, 870; Uther *v.* Rich, 10 Adolphus and Ellis, 784; Arbouin *v.* Anderson, 1 Adolphus and Ellis, N. S., 498; Stephens *v.* Foster, 1 Cromp., Mees., and Roscoe, 849; Palmer *v.* Richards, 1 Eng. Law and Eq. R., 529; Marston *v.* Allen, 8 Mees. and Wels., 494; Raphael *v.* Bank of England, 33 Eng. Law and Eq. R., 276.)

5. The rule is understood in this country according to the latest cases in England. (Story on Bills of Exchange, 194, 416; Hull *v.* Wilson, 16 Barbour S. C. R., 550; Saltmarsh *v.* Tuthill, 13 Ala. R., 390.)

*Mr. Geyer* made the following points:

The decision of the Circuit Court in overruling the motion of the plaintiff for a new trial not being the subject of review on a writ of error, the only questions for the consideration of this court arise on the instructions given to the jury; and these, the defendant submits, were quite as favorable to the plaintiff as the law would allow.

I. It having been established, by the evidence at the trial, that Wallace Sigerson, the drawer, had no interest in the bill sued on, and no authority to use, transfer, or otherwise dispose of it for his own benefit; that he transferred it to the plaintiff fraudulently, in violation of a special trust, the burden devolved upon him to prove that he acquired the bill in good faith, for a valuable consideration, in the usual course of trade; failing in that, he was not entitled to recover. (Baily *v.* Bidwell, 13 Mees. and W., 73; Harvey *v.* Towers, 6 Welsby, H. and G., p. 656; Monroe *v.* Cooper, 5 Pick., 412; Bissell *v.* Morgan, 11 Cushing, 198; Sanford *v.* Norton, 14 Vermont R., 228; Bertrand *v.* Barkman, 13 Ark., 150: Thompson *v.* Armstrong, 7 Ala. R., 256; Snyder *v.* Riley, 6 Barr. Pa. R., 664; McKeeson *v.* Stansbury, 3 Ohio N. S., 156; Ware *v.* Boydell, 3 M. and S., 148; Beltzhoover *v.* Blackstock, 3 Watts, 26; Vallet *v.* Parker, 6 Wend., 615; Catlin *v.* Hanson, 1 Duer N. Y. R., 322.)

II. The bill was not transferred absolutely and unconditionally, in the usual course of trade, for a valuable consideration. It was delivered to the plaintiff, and received by him, merely as collateral security for an antecedent debt, the general property remaining in the drawer, not in the plaintiff; there was no money, goods, or credit given, or liability incurred; no security or valuable right relinquished by the plaintiff, nor any new and distinct consideration of any kind for the transfer of the bill. Therefore the plaintiff was not a *bona fide* holder for value as against the defendant, so as to exclude the defences which he had against the drawer. (Jenness *v.* Bean, 10 N. H. R., 266; Williams *v.* Little, 11 ib., 66; Coddington *v.* Bay, 20 Johns. R., 637; Wardell *v.* Howell, 9 Wend., 170; Clark *v.* Eli, 2 Sandf. Ch. R., 166; White *v.* Springfield Bank, 1 Barb. S. C. R., 225; Stalker *v.* McDonald, 6 Hill N. Y. R., 93; Petrie *v.* Clark, 11 Sergt. and R., 388; Jackson *v.* Pollock, 2 Miles Pa. R., 362; Evans *v.* Smith, 4 Binney, 366; Napier *v.* Elam, 6 Yerg., 108; Nichol et al. *v.* Bate, 10 Yerg., 429; Kimbro *v.* Lyttle, 417; Van Wyck *v.* Norvell, 2 Humph. R., 192; Prentice *v.* Weisinger et al., 2 Gratton, 262; Bank of Mobile *v.* Hall, 6 Ala. R., 639; Andrews *v.* Brothers & McCoy, 8 ib., 920; Bertrand *v.* Barkman, 13 Ark. R., 150; Anderson *v.* Long, 1 Mo. R., 365; Goodman *v.* Simonds, 19 Mo. R., 106.)

III. It was fully proved, and found by the jury, that the drawer (Sigerson) never had any interest in the bill or its proceeds, and no authority to dispose of it for his own benefit; that, at the time of the transfer, facts and circumstances were known to the plaintiff which caused him to suspect, or would have caused a person of ordinary prudence to suspect, the defect of the title and authority of the drawer, and that by ordi-

nary diligence he might have ascertained that the drawer had no interest in the bill, or authority to use it for his own benefit. The plaintiff must therefore be held to have taken the bill subject to all the defences which the defendant had against the drawer. (Peacock *v.* Rhodes, Douglass, 633; Down *v.* Halling, 4 B. and C., 330; 2 Car. and P., 11; Snow *v.* Peacock, 3 Bing., 406; 2 C. and P., 215; Slater *v.* West, 3 Car. and P., 325; Solomans *v.* Bank of England, 13 East, 135; Gill *v.* Cubitt, 4 Barn. and C., 466; De La Chaumette *v.* Bank of England, 9 Barn. and C., 208; Haynes *v.* Foster, 4th Tyrw., 65; Hatch *v.* Searles, 31 Eng. L. and E. R., 219; Ayer *v.* Hutchins, 4 Mass., 370; Cone *v.* Baldwin, 12 Pick., 545; Hall *v.* Hale, 8 Con., 336; Beltzhoover *v.* Blackstock, 3 Watts, 25; McKeeson *v.* Stansbury, 3 Ohio N. S.; Russell *v.* Haddock, 3 Gil. Ills., 233; Nicholson *v.* Patton, 13 La. R., 216; Lapice *v.* Clifton, 17 ib., 152; L'Anfear *v.* Blosman, 1 La. An. R., 156; La. State Bank *v.* N. O. Nav. Co., 3 La. An., 294; Fowler *v.* Brantly, 14 Pet., 318; Andrews *v.* Pond, 13 Pet., 79.)

*Mr. Geyer* then proceeded to review the cases and elementary authorities in an elaborate argument, which would doubtless be interesting to the profession, if the reporter had room to insert it. But he can only find space for the concluding part, which was as follows:

This review of the adjudged cases in England exhibits the concurrent authority of all the decisions in bank in support of the doctrine that the holder of a negotiable instrument, who has taken it without reasonable caution, and under circumstances which ought to have excited the suspicion of a prudent and careful man that it was not good, is not protected against the defences of prior parties. It is claimed, however, that this doctrine has been overruled by more recent decisions. (Crook *v.* Jadis, 5 Bar. and Ad., 909; Backhouse *v.* Harrison, ib., 1098; and Goodman *v.* Harvey, 4 Ad. and E., 870.) And it must be conceded that they do in terms repudiate that doctrine, so long and so firmly established; but it may well be questioned whether they are of sufficient authority to overturn it and change the law in England, or induce the American courts to abandon it.

The case of Crook *v.* Jadis was an action by an endorsee against the drawer of an accommodation bill; it was tried at the Middlesex sittings, after Michaelmas term, 1833, before Denman, Ch. J., who told the jury to find for the plaintiff, if they thought he had not been guilty of *gross negligence* in taking the bill under the circumstances given in evidence. The jury having found for the plaintiff, the counsel for the defendant moved for a new trial, citing Down *v.* Halling. The motion

was disposed of in a very summary way by the court in bank. Denman, Ch. J., said: "I used the expression *gross negligence* advisedly, because I *thought* nothing less ought to have prevented the plaintiff recovering on the bill." Littledale, J., who had approved the existing doctrine in Rothschild *v.* Corney et al., 9 B. and C., 388, said: "There must be gross negligence *at least, in a case like the present,* to deprive the party of his right to recover on a bill of exchange." Taunton, J., said: I think the case was properly submitted to the jury. *I cannot estimate the degree of care which a prudent man should take.* The question put by the Lord Chief Justice, whether the plaintiff was guilty of *gross negligence,* was more definite and appropriate." Patteson, J., said: "I *never could understand* what is meant by a party's taking a bill under circumstances which ought to have excited the suspicion of a prudent man." In Backhouse *v.* Harrison, decided at the same term, the same doctrine was held, on the authority of Crook *v.* Jadis; no additional reasons are given for the opinion, except that Patteson, J., had "*no hesitation* in saying that the doctrine first laid down in Gill *v.* Cubitt, and acted upon in other cases, has gone too far, and ought to be restricted." In Goodman *v.* Harvey, decided in 1836, a non-suit was taken, and the case came before the court in bank, on a rule *nisi* for a new trial. The only opinion reported was by Lord Denman, Ch. J., who said: "The question I offered to submit to the jury was, whether the plaintiff had been guilty of gross negligence or not. I believe we are all of opinion that gross negligence only would not be a sufficient answer, where the party has given consideration for the bill. Gross negligence may be evidence of *mala fides,* but it is not the same thing. We have *shaken off* the last remnant of the contrary doctrine. Where the bill has passed to the plaintiff without any proof of bad faith in him, there is no objection to his title."

The ruling in the last case is at variance with the decisions in the two preceding, made by the same court only two years before, and is coincident with the doctrine urged by Mr. Denman, as counsel in Down *v.* Halling, without success. In all of them it is assumed that the holder is not affected by constructive notice of the defect or infirmity in the title. In neither of them is the decision placed upon principle or authority, or sustained by any intelligible judicial reasoning. Decisions so arbitrary and inconsistent cannot be regarded as of sufficient authority to overturn the doctrine established by an uninterrupted series of decisions by the Courts of King's Bench, Common Pleas, and Exchequer, and founded on principle as well as authority.

The more recent cases cited in support of the doctrine of Lord Denman are, Stevens *v.* Foster, 1 Crom. Mer. and R., 849; Uther *v.* Rich, 10 Ad. and E., 784; Arbouin *v.* Anderson, 1 Ad. and E., N. S., 498; and Masters *v.* Ibberson, 1 Com. and B., 100. In the first of these cases, the question was not made, but the case was considered by the court in bank, together with Foster *v.* Pearson, arising out of the same transaction; and it was in reference to the direction given to the jury at the trial of the latter case, (as in Gill *v.* Cubitt,) that Baron Park, in delivering the judgment of the court, expressed a doubt of its propriety, especially since the decisions of the King's Bench, in Crook *v.* Jadis. and Backhouse *v.* Harrison, but said it was unnecessary to decide the question then, and, assuming the direction to be correct, decided the case on other grounds.

In the other cases, the questions arose on the pleadings, under the new rules. In Uther *v.* Rich, decided in 1839, the sole question was, whether *mala fides* is alleged by an averment in a plea that the plaintiff was not a *bona fide* holder of the bill. Lord Denman said: "That the court adhered to the decision in Goodman *v.* Harvey, from which it followed that in pleading, *mala fides* must be distinctly averred." In Arbouin *v.* Anderson, decided in 1841, Lord Denman took occasion to say that, "acting upon the case of Goodman *v.* Harvey, which gives the law now prevailing on the subject, we must hold that the owner of a bill is entitled to recover upon it, *if he has come by it honestly*, and that the fact is implied by possession; and that, to meet the inference so raised, fraud, felony, or some such matter, must be proved." In Masters *v.* Ibberson, decided in 1849, (an action by the second endorsee against the maker of a note,) the defendant pleaded that the note was obtained from him by a person—not a party—and others in collusion with him, by fraud, and that there never was any value or consideration for either of the endorsements. This plea was held bad on special demurrer, because it did not allege that the payee was a party to the fraud, or had given no consideration for the note.

It does not appear that the doctrine in the case of Goodman *v.* Harvey has been held by any court except the King's Bench; and in the case of Hatch *v.* Searles, decided in 1854, (31 Eng. Law and Eq. Rep., 219,) the doctrine repudiated by the King's Bench was distinctly asserted. In a suit for the administration of the estate of a deceased person, a claim was made by the holder of a bill of exchange to be admitted as creditor; but it being proved that the holder, who was endorsee of the bill, was aware of the fact of the acceptance being in blank, it was held that he must be taken to have had as full knowledge

of the circumstances of the origin of the bill as he might have acquired if he had made proper inquiry; that is, the facts and circumstances known to the holder at the time of the transfer amount to constructive notice of the defect or infirmity of the title, and this is no doubt the true ground. It is agreed on all sides that express notice is not indispensable, and constructive notice will have the same effect, and the facts and circumstances which will amount to actual or constructive notice may not be sufficient to prove fraud or *mala fides* in the holder.

The American courts do not appear to have had much difficulty at any time in determining what facts and circumstances would amount to actual or constructive notice of any defect or infirmity in a bill. In every case in which the question was presented, (with the exception of one in Georgia,) the language of the judges as to the necessity of caution on the part of the holder, and of inquiry when he had cause to suspect the title to a bill, has been explicit. Before the decision of the case of Gill *v.* Cubitt, the doctrine it recognises had been held in two of the States, by courts of as high authority on questions of commercial law as any of the courts of England or any other country.

As early as 1808, the Supreme Court of Massachusetts held, in Ayer *v.* Hutchins, (4 Mass. R., 470,) that "where the endorsee receives the note under circumstances which might reasonably excite suspicion, he ought, before he takes it, to inquire into its validity, and if he does not, he takes it subject to any legal defence that could defeat a recovery by the payee. In 1815, the Supreme Court of New York, in Wiggin *v.* Bush, (12 John. R., 305,) where the note sued on was dated 24th May; and it appeared by an endorsement that it was in fact made 22d April, held that by the endorsement on the note of the real date, the plaintiff (endorsee) had information which ought to have led to inquiry into the manner in which the note had been obtained by the payee; the past dating a note which · was endorsed, was an extraordinary circumstance, and ought to have excited suspicion, and that their neglect to make the inquiry subjected them to all the consequences of the transaction between the immediate parties.

In the next case in order of time, Brown *v.* Tabor, (5 Wend., 566,) decided in 1830 by the Supreme Court of New York, the defendant was an endorser for the accommodation of the maker of a note of sixty days, with a view to obtain a discount at the bank, which being refused, the maker passed the note, with the bank marks upon it, to the plaintiff, for lottery tickets; held that the circumstances combined were sufficient to put the plaintiff upon the inquiry, and that he was chargeable with

notice of the misapplication of the note, and that the endorser was not liable. In Hall *v.* Hale, (8 Conn., 336,) decided by the Supreme Court of Connecticut in 1831, the actual good faith of the plaintiff was not impeached, and the case turned upon the question whether he had exercised due caution in receiving the transfer. Hosmer, Chief Justice, delivering the opinion of the court, said: "That the law was well settled, that if an indorsee take a bill without due caution, and under circumstances which ought to have excited the suspicions of a prudent and careful man, the maker, acceptor, or prior endorser, may be let into his defence;" and he cited Gill *v.* Cubitt, among other cases, as authority. The verdict, however, was set aside, because the judge at the trial had misled the jury by requiring the utmost possible caution. In Cone *v.* Baldwin, (12 Pick., 545,) the court upon the whole case gave judgment for plaintiff, endorsee, against the maker of the note. But Wilde, J., delivering the opinion of the court, said: "It is not necessary for the defendant, in order to set up his defence, to prove that the plaintiff had full knowledge of the want or failure of consideration. If the circumstances attending the transfer are such as to put him upon his guard, he is bound to make inquiry, and if he does not, he purchases at his peril."

The Supreme Court of Tennessee, in Hunt *v.* Sanford, (6 Yerg., 387,) held that the endorsee or purchaser of a bill or promissory note must exercise due caution; and if he takes it under circumstances which might reasonably create suspicion that it was not good, he takes it at his peril; therefore, where a note of a solvent maker is sold at a very great discount, with an agreement on the part of the purchaser to pay a further sum if the note is collected without suit, the purchaser is subject to the same defence as the party from whom he purchased. In Beltzhoover *v.* Blackstock, (3 Watts. Pa. R., 25,) Sergeant, J., said: "I concur in the position, that if an endorsee take a note heedlessly, and under circumstances which ought to have excited the suspicions of a prudent and careful man, the maker or prior endorsee may be let in to his defence." In Nicholson *v.* Patton, (13 La. R., 216,) the Supreme Court of Louisiana, (in 1839,) three years after the decision in Goodman *v.* Harvey, took the rule in Gill *v.* Cubitt as their guide, and held that where a note is taken by a broker, under circumstances affording reasonable ground of suspicion, questions must be asked and inquiries made, whether the party from whom it is received came by it honestly; and if he take it without such inquiry, with a view to profit, it is at his own risk. The same doctrine was held in Lapice *v.* Clifton, (17 La. R., 152.)

In Andrews *v.* Pond et al., (13 Pet., 65,) an action on a bill

of exchange by the third endorsee against the first endorsers, the bill had been protested for non-acceptance while in the hands of the second endorsee, and that fact appeared on the face of the bill when received by the plaintiff. In delivering the judgment of the court, Chief Justice Taney said: "A person who takes a bill which upon the face of it was dishonored cannot be allowed to claim the privileges which belong to a *bona fide* holder without notice. If he chooses to receive it under such circumstances, he takes it with all the infirmities belonging to it, and is in no better condition than the person from whom he received it. There can be no distinction between a bill transferred after it is dishonored for non-acceptance, and one transferred after it is dishonored for non-payment." In Fowler *v.* Brantly, 14 Pet., 318, the note sued on was in a peculiar form prescribed by the Branch Bank at Mobile, when desired to be discounted for accommodation, made payable to the cashier or bearer, signed by the defendants, with a written order, also signed by them, to credit a person who was their factor, and to whom the note was sent to be offered for discount. The bank refused to discount it, and the figures "169" were written in pencil on its face, according to the usage of the bank in such cases. The factor sold the note, and applied the proceeds to his own use, and it was received by the plaintiff from a subsequent holder, in part payment of a precedent debt. Held, that "the note carried on its face circumstances of suspicion so palpable as to put those dealing for it before its maturity on their guard, and as to require at their hands such inquiry into the title of those through whose hands it had passed. Failing to be thus diligent, they must abide the consequences their negligence imposed, and could not recover, though they had not, *in fact,* knowledge of the fraud."

In Sanford *v.* Norton, 14 Vermont R., 228, A. D. 1842, Redfield, Judge, delivering the judgment of the court, said: "When it is shown that a note or bill was without consideration, or void in its inception, being obtained by force or fraud, or had been lost, this does so far impeach the title of the holder as to impose upon him the obligation of showing that he paid value, and in many cases that he was guilty of no want of ordinary care in taking it. Gill *v.* Cubitt, which has reference to lost notes, turns upon the point of their being taken without due caution. Some of the later cases, in regard to this particular point, seem to have receded a little from this case; but the doctrine of Gill *v.* Cubitt is in the main adhered to, and we do not well see how any other rule could consist with any tolerable regard to justice." The Supreme Court of Illinois, in McConnell *v.* Hodson, 2 Gilm., 640, and Russell *v.* Haddock,

3 Gilm., 233, A. D. 1846, held, that where a party is about to receive a bill or note, and there are any suspicious circumstances accompanying the transaction, or within the knowledge of the party, as would induce a prudent man to inquire into the title of the holder or the consideration of the paper, he will be bound to make such inquiry; and if he neglects so to do, he takes the paper subject to any defences of the prior parties.

The case of Mathews *v.* Poythess, 4 Georgia R., 287, A. D. 1848, is the next in the order of time. It is the first and only reported case in which an American court has held the late doctrine of the King's Bench. The conclusion of the court in that case is, that the title of the purchaser is not defeated by the want of such caution on his part as a careful or prudent man would take in his own affairs, nor by gross negligence; that it may be defeated by proof of *mala fides* in the purchaser; that *mala fides* is *notice actual or constructive of the fact* that the security is not the property of the person who offers it, *and a privity with or participation in the fraud* upon the true owner; and that the want of proper caution, or any fact that legitimately goes to show such *notice, privity*, or *participation*, may be submitted to the jury, subject to the direction of the court." The extreme doctrine of this case, if established, would be very acceptable, no doubt, to those dealers whose usual business is ordinarily conducted behind a screen, who, if allowed to keep their own secrets, will take the risk of proof of notice *and* privity with or participation in the fraud or robbery, by which the paper was obtained, and, if it should happen in any case that such proof could be made, he could and would bring his suit in the name of some confederate against whom the proof could not be made. Fair dealers need no concealment, and the experience of half a century in this country has demonstrated that the rule first laid down in Ayer *v.* Hutchins, 4 Mass. R., 470, while it has led to greater caution in receiving bills and notes, has not restrained the circulation of negotiable paper among fair dealers. It has promoted the administration of justice, without prejudice to the interests of commerce.

In the same year, (1848,) the subject was again under consideration of the Supreme Court of Louisiana, in the case of the Louisiana State Bank *v.* The New Orleans Navigation Co., 3 La. An. R., 294, when it was held that express notice is not necessary to charge the holder with what the law considers to be notice of any defect or infirmity in a note or bill, so as to let in a defence against a holder for value; it is sufficient if the attending circumstances are of such a positive and pointed character as to cast a shade upon the transaction, to put the holder upon inquiry. In Ohio, in 1853, it was held in McKeeson *v.* Stans-

bury, 3 Ohio R., N. S., 156, that although a *bona fide* holder of negotiable paper, received before due for a valuable consideration, shall be protected against the defences which the maker might have against the payee, yet in this case, as in every other, it is the duty of every person to use ordinary care and prudence in his transactions, to prevent their operating to the prejudice of the rights of others; and where the transfer is fraudulent, the holder, claiming under such a transaction, is bound to show that he acted honestly and without knowledge of the fraud.

In the case of Holbrook et al. *v.* Mix, 1 E. D. Smith R., 152, New York Court of Common Pleas, 1851, the defendant endorsed the note sued on for the accommodation of the makers, from whom it was obtained by false and fraudulent representations, by one Beach, who, being indebted to the plaintiffs, enclosed the note to them in a letter, requesting them to pass the note to his credit, saying, that as he understood it would be contested, he did not endorse it. The plaintiffs passed the note to his credit, less the interest. It was held that the plaintiffs had not received the note in due course of trade, and that the circumstances under which it was received deprived the plaintiffs of all claim to be regarded as *bona fide* holders for value, without notice of the fraud.

It is a well-established principle, that whatever is notice enough to excite attention, and put a party on its guard and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed to have notice of it. (Kennedy *v.* Green, 3 Mylne and K., 719; Sugden V. and P., 1052.)

"The principle of the doctrine of constructive notice is, that when a person is about to perform an act by which he has reason to believe that the rights of a third party may be affected, an inquiry into the facts is a moral duty, and diligence, an act of justice. Hence, he proceeds at his peril when he omits to inquire, and is chargeable with a knowledge of all the facts that by a proper inquiry he might have ascertained. This neglect is followed by all the consequences of bad faith, and he loses the protection to which his ignorance, had it not proceeded from neglect, would have entitled him." (Per Duer, J., in Pringle *v.* Phillips, 5 Sand. R., 157.)

"Nor is constructive notice an arbitrary doctrine, or an unwise attempt to enforce by law a rule of morality. It is founded upon a deep knowledge of human nature, and is justified by the soundest reasons of public policy. It will rarely happen that a knowledge of the fraud, or other fatal vice, by which

the title he received was infected, can be brought home to the purchaser by positive evidence; yet to release him in all cases from the obligation to inquire, is to determine that, in all cases, such evidence shall be given. On the other hand, when it is manifest to the minds of a jury that just grounds of suspicion existed, we may be certain, as a general rule, that the suspicion was felt by the purchaser, and that he chose not to inquire, because he was resolved not to know. Constructive notice may doubtless operate, in some cases, to defeat the title of deceived and innocent purchasers, but its general effect is to reach those who meant, by their voluntary ignorance, to cover their fraudulent intent; and it is in truth so essential to the protection of deceived and innocent owners, that to abolish it would be to encourage, if not by the promise, yet by the certain hope of impunity, dishonesty, collusion, and fraud." (Ibid.)

The decisions which have been cited of all the courts of England in bank prior to 1834, and of the American courts at all times, with a single exception, are but the application of the general principles to particular cases. That principle applied to this case is decisive against the plaintiff, as well upon the undisputed facts proved at the trial as those found by the jury.

It was proved beyond controversy that the plaintiff took the bill with a full knowledge of several facts and circumstances, each one of which has been held sufficient to charge a holder of negotiable paper with notice of defects or infirmities in the title. He took the bill which he had refused to discount, from his debtor, known to be insolvent, merely as a pledge to secure a desperate debt. (See Eagan *v.* Threlf et al., 5 Dowl. and R., 326; Bay *v.* Coddington, 5 J. C. R., 54.) He received it with a knowledge that it had been a long time in the hands of his debtor in blank, while he was in pecuniary difficulties. (Hatch *v.* Searles, 31 English Law and Eq. R., 219.) He not only knew the bill to be falsely dated, but he himself filled the blank with the false date it bore. (Wiggin *r.* Bush, 12 John. R., 305.) He attempted to pass it off, not only without the endorsement of his firm or his own, (Holbrook *v.* Mix, 1 E. D. Smith R., 112,) but gave a false reason for refusing to endorse. Neither the plaintiff nor his firm had authority to sell the bill for another; on the contrary, they had stipulated not to dispose of it, nor put it into circulation before the maturity of the notes of their debtor; the demand by the debtor of such a stipulation was alone sufficient to put the plaintiff and his firm on their guard. Under these circumstances, the plaintiff cannot complain if he 'is held to have taken the bill subject to the defences of the defrauded acceptor.

The facts found by the jury admit of no other conclusion

than that the plaintiff either had actual notice that the drawer had no title or interest in the bill, and no authority to dispose of it for his own use, or that he had a suspicion of the fact, and abstained from inquiry for the purpose of avoiding notice; which would be sufficient to establish a charge of guilty knowledge, even in a criminal case. If it appeared that a party charged with receiving stolen property of any kind, knowing it to be stolen, had received it "with a knowledge of facts and circumstances which caused him to suspect, or would have caused a person of ordinary prudence to suspect, that it was stolen, and that he could have ascertained the fact by the use of ordinary diligence," he could not have escaped conviction on the plea that he had taken it to secure a debt which had become desperate by insolvency of the debtor, and "was not bound to take care of the interest of third persons." The same state of facts appearing in a transaction requiring good faith and due diligence on the part of the holder, by the commercial law which he invokes, cannot be less than proof of notice of everything which might have been ascertained by the use of ordinary diligence.

Mr. Justice CLIFFORD delivered the opinion of the court.

This was a writ of error to the Circuit Court of the United States for the district of Missouri.

Timothy S. Goodman, a citizen of the State of Ohio, complained in the court below of John Simonds, a citizen of the State of Missouri, in a plea of trespass on the case upon promises. The declaration was filed on the first day of March, 1854. It contained two counts—one upon a bill of exchange, and the other upon an account stated. At the April term following, the defendant appeared and pleaded the general issue, which was joined, and several special pleas in bar of the action. The special pleas were held bad on demurrer, and at the October term, 1855, the parties went to trial on the general issue. Robert M. Nesbit, a witness called for the plaintiff, testified that he was a notary public of the county of St. Louis; and that, as such, on the fifteenth day of January, 1848, he presented the bill in suit for payment to John Simonds, the acceptor, who refused to pay it, and that he afterwards gave due notice of the presentment and refusal to both endorsers. And the witness further testified, that he was well acquainted with the signatures of all the parties to the bill, except that of the drawer, and that they were genuine. Whereupon the plaintiff read in evidence the bill of exchange described in the first count of the declaration, together with the endorsements thereon, as they appear in the record. W. Nesbit & Co. were merely nominal hold-

ers of the bill, never having had any interest in it, and only endorsed it to the plaintiff for the greater convenience in bringing the suit. Evidence was then introduced on the part of the defendant, exhibiting substantially the following state of facts: On the twenty-first day of June, 1847, the defendant addressed a letter to Wallace Sigerson, who resided at Cincinnati, informing him that he wished to avail himself of banking facilities in that place, to carry on certain business, in which he and John Sigerson had determined to engage, and asking his assistance, as a correspondent, to negotiate discounts, enclosing at the same time his letter of credit for ten thousand dollars, and two bills of exchange, each for the sum of five thousand dollars, and suggesting in the same letter that they should require some twenty to twenty-five thousand dollars during the next four or five months, in sums of about five thousand dollars, as the same could be used from time to time. In the same letter also he instructed his correspondent to negotiate five thousand dollars immediately, authorizing him to use for that purpose either the letter of credit or the bills of exchange. When those bills were transmitted to Cincinnati, they were in all respects perfect bills of exchange, except that the name of the drawer was wanting, and they were without date. They were both made payable to the order of John Sigerson, and by him endorsed in blank, and were accepted by the defendant. Soon after their receipt, Wallace Sigerson, as drawer, procured one of the bills to be discounted according to his instructions, and remitted the proceeds, or a part thereof, to the defendant; and it also appeared that, during that season, he procured other bills of the same kind, to be discounted for the same parties, to the amount of twenty-five thousand dollars. The other bill forwarded at that time is the one now in suit. Wallace Sigerson had also large transactions of his own, the same season, amounting to four hundred thousand dollars. Many of his own transactions were with his brother, John Sigerson, who was the payee and endorser of this bill, and was jointly engaged in the same business with the defendant. He and his brother interchanged accommodation paper, and some of their acceptances were regularly discounted in bank, and it did not appear that any complaint was made, either by the acceptor or endorser, that this bill had not been accounted for or returned. There were dealings, also, the same season, between T. S. Goodman & Co. and Wallace Sigerson. They made a settlement on the twelfth day of October, 1847, when it was ascertained that the amount due to T. S. Goodman & Co. was about five thousand six hundred dollars, arising principally from notes discounted, secured by bills of exchange as collaterals, on which nothing

had been realized. At the settlement, the debt was divided into two notes, one having sixty and the other seventy-five days to run; and Wallace Sigerson testified that he gave his two notes in payment of the debt, and left this bill as collateral security to the notes, fixing the dates so that the notes would mature twelve or fifteen days before the bill. Two drafts on Ravisess, Bulock, & Co., previously held as collaterals, were embraced in the settlement, and formed a part of the indebtedness for which the notes were given; and McDonald, who was the book-keeper of the plaintiff's firm, and a witness for the defendant, testified he knew of no other collateral security than this bill, which the firm held for those notes. It would seem, therefore, that all the prior collaterals were surrendered to the defendant at the settlement. There is some confusion, and perhaps uncertainty, in the evidence reported, respecting the history of the bill from the time it went into the possession of Wallace Sigerson till it was thus placed in the hands of T. S. Goodman & Co., as collateral security to the above-mentioned notes. It may, however, be gathered from the testimony of Wallace Sigerson, that he first offered it for discount to the Ohio Life and Trust Company, and shortly afterward to the plaintiff, for the same purpose, and that the plaintiff declined to discount it, but soon after took it as collateral security for temporary loans. How long the bill remained in the possession of the plaintiff as collateral security for temporary loans does not appear, nor for whose benefit the money was obtained. When the settlement took place, Wallace Sigerson told the plaintiff that he had a right to use the bill, and the plaintiff agreed that it should not be sent to St. Louis for collection till after the maturity of the notes to which it was collateral. Nothing of the kind was agreed when it was left as collateral security for temporary loans. Wallace Sigerson became the drawer of this bill, as he had previously done with respect to the other, which was sent him at the same time, and filled up the date, but whether at the time of the settlement, or previously, was not entirely certain. He failed in business in November, 1847, and on the twentieth day of the same month, T. S. Goodman & Co. addressed a letter to C. W. Clark & Brothers, enclosing this bill, and requesting them to pass it at the least rate, not exceeding twelve per cent. interest, saying, "We do not endorse it, as we are selling it for another; and when L. C. Clark, one of that firm, a few days afterward offered the bill for sale to the defendant, "he said it was a forgery of his name; that Wallace Sigerson had no authority to use it." At the trial, the court, on the prayer of the plaintiff, instructed the jury to the effect, that if the plaintiff acquired the bill of Wallace Sigerson as

collateral security without notice of his want of authority to transfer it, that the plaintiff was unaffected by such abuse of trust, and that the defendant was precluded from setting it up as a defence in this suit, to which no exceptions were taken. We pass over the first instruction given to the jury on the prayer of the defendant, for the same reason that it was not excepted to, and proceed to examine the second, as amended by the court, which presents the principal subject of controversy at the present time. It was to the effect, that "if such facts and circumstances were known to the plaintiff as caused him to suspect, or that would have caused one of ordinary prudence to suspect, that Wallace Sigerson had no interest in the bill, and no authority to use the same for his own benefit, and by ordinary diligence he could have ascertained these facts, then the jury will find for the defendant."

·I. The general question which the bill of exceptions presents, arising upon that instruction, is certainly one of very considerable importance, especially to the mercantile community, as it affects the transfer and free circulation of bills of exchange and promissory notes, which, by virtue of their negotiable quality, constitute the principal medium for the transaction of their business affairs. There is, however, some reason to doubt whether the evidence at the trial furnished any proper basis for the application of the instruction in this case, even supposing the principle announced to be correct as an abstract proposition; and this gives rise to a preliminary question, which will be first considered, whether the instruction ought not to be regarded as objectionable on that account. When a prayer for instruction is presented to the court, and there is no evidence in the case for the consideration of the jury, it ought always to be withheld; and as a general rule, if it is given under such circumstances, it will be error in the court, for the reason that its tendency may be and often is to mislead the jury, by withdrawing their attention from the legitimate points of inquiry involved in the issue. All that was shown at the trial, in addition to the description of the bill, was the refusal of the plaintiff to discount it when it was offered for that purpose, his possession and control of it shortly after, as a pledge for temporary loans, and the subsequent transfer of the bill to him as collateral security at the settlement, together with the circumstances of that transaction, and what appeared in the letter of T. S. Goodman & Co., transmitting the bill to St. Louis for sale. Other circumstances are adverted to in the printed argument for the defendant; but as they do not appear to be sustained by the evidence in the case, they are omitted. Nothing transpired when the bill was offered for discount, more than

what occurs on similar occasions in the daily transactions among business men. It was offered and declined, and that was the whole transaction, so far as it was disclosed in the evidence. No reasons were assigned by the plaintiff for declining, and none were asked for by the holder, who offered the bill. Mere speculative inferences are never allowable, and cannot be regarded as evidence. The refusal to discount the bill might have been for the reason supposed in the instruction; and so also it might have been for a very different reason, such as a prior obligation to other customers, want of available funds, or from a desire for farther information as to the pecuniary standing of the parties to this bill; and whether it was for any one of the reasons suggested, or some other, in the absence of any explanation, was a mere naked conjecture. Another answer may also be given to this suggestion, which is equally decisive, and that is the subsequent conduct of the plaintiff in taking the bill as a pledge for temporary loans, which seems to negative the supposition altogether that the previous refusal to discount it was on account of any suspicion he entertained, either as to the genuineness of the paper or of the authority of the holder to pass it. Some time elapsed, after the bill was offered for discount, before it was finally transferred to the plaintiff, and that fact undoubtedly was well known to the plaintiff at the time of the transfer; and so also was the more important one in this investigation, that during all that time the bill remained in the custody or under the control of Wallace Sigerson, as the ostensible owner, and that he claimed and exercised over it all the rights of a holder for value. If these circumstances are taken in connection with each other, as they unquestionably should be, there can be no doubt they were far better suited to inspire confidence in the title of the holder than to excite suspicion in regard to his authority to pass the bill; and if they had that effect, it was plainly the fault of the defendant in executing and forwarding the bill to his correspondent, and in intrusting it to his control, and suffering it to remain in his custody without inquiry or complaint. The want of date to the bill at the time it was offered for discount, under the circumstances disclosed in the evidence, was entirely an immaterial consideration. When the defendant sent the bill to Wallace Sigerson, endorsed in blank and without date, and intrusted it to his care and discretion, to be used for his own benefit, he thereby empowered him to fill the blank, as a necessary incident to the trust conferred, just as effectually as if the authority had been expressly delegated by the terms of the letter in which it was sent. Nor was it of any consequence that it was antedated, as compared with the time

when it was passed to the plaintiff, inasmuch as it was filled up by his own correspondent, before he parted with its possession and control, and was actually made to bear date subsequent to the time when it was received from the defendant. In filling it up, he but carried into effect one of the purposes for which it had been forwarded, as is plainly indicated from the general scope and design of the letter. He was authorized to use the bill to raise money for the benefit of the defendant; and in order to use the bill for that purpose, it must have been expected that he would become the drawer, and fill up the date at his discretion. Independently, however, of the terms of the letter, it may be asserted, as a general principle, that where a party to a negotiable bill of exchange or promissory note intrusts it to the custody of another, when it is without date, whether it be for the purpose to accommodate the person to whom it was intrusted, or to be used for his own benefit, such bill or note carries on its face an implied authority to fill up the blank; and, as between such party to the bill or note and innocent third parties, the person to whom it was so intrusted must be deemed the agent of the party who committed such bill or note to his custody, and as acting under his authority, and with his approbation. (Mitchel *v.* Carver, 10 Wend., 336 and note.)

The general doctrine on this subject, and the reasons on which it is founded, are stated by Shaw, C. J., in Androscoggin Bank *v.* Kimball, (10 Cush., 373,) as follows: "The rule is very clear, that if one party, intending to accommodate another, signs his name to a blank paper, he authorizes the other to whom he delivers it, and for whose accommodation it was made, to fill up the blank; and the filling up, being done by his authority, is his act, and he is bound by it; and we concur in the principle, and think it applies with even more force when it was done for his own benefit, as in this case." (Violet *v.* Patton, 5 Cran., 142; Russell *v.* Langstaffe, 2 Doug., 514; Collis *v.* Emmet, 1 H. Back, 313; Montague *v.* Perkins, 22 Eng. L. and Eq., 516.)

The circumstances thus far considered we think afforded no ground of inference whatever to support the theory of fact assumed in the instruction. But it is more difficult to dispose of those that follow in the same way, on account of the extremely indefinite nature of the inquiry arising under the instruction. One man is more readily influenced to suspect fraud in matters of business than another, and the same individual may be differently impressed by similar transactions occurring at different times under *precisely* similar circumstances; so that in some cases, where the evidences to excite suspicion were

slight, it might be impossible to determine whether they were or were not of a character to be regarded as tending to support an issue like the one presented under the first branch of the instruction, without first ascertaining the general characteristics of the mind of the individual who was the subject of the inquiry, and his usual habit in conducting his business affairs. A striking illustration of the difficulty attending the investigation is to be found in the instruction itself, assuming for the present that it must be understood according to the usual import of the language employed. Under its first branch it was necessary, in order to relieve the defendant, that the jury should find that such facts and circumstances were known to the plaintiff as caused *him* to suspect the title or authority of the holder to transfer the bill. But the jury might come to the conclusion that the plaintiff was thoughtless, confiding, or inattentive on the occasion, and that he in fact took the bill without any such suspicion ; and to guard against the effect of such a finding, the second branch of the instruction was framed, and under that it was of no consequence whether the plaintiff himself suspected the title of the holder or not, as the defendant was nevertheless to be fully exonerated if the jury found that such facts and circumstances were known to him as would have caused one of ordinary prudence to suspect, and by ordinary diligence he could have ascertained, the true state of the title. Here was an attempt to prescribe a standard in the investigation, by which the degree of suspicion intended to be required to defeat the claim of the plaintiff could be ascertained and measured by the jury; but under the first branch of the instruction no such attempt was made, and no other criterion was furnished to guide the jury in their deliberations, than mere naked suspicion; and consequently, if the jury believed, from the evidence in the case, that the plaintiff at the time of the transfer suspected the title or authority of the holder to pass the bill, no matter how slight his suspicions were, they were directed to return their verdict for the defendant. With this explanation as to the nature of the present inquiry, we will proceed to notice the remaining circumstances relied on as evidence in the case to support the instruction. They consist of the knowledge that the plaintiff is supposed to have acquired at the settlement, that Wallace Sigerson was embarrassed in his business affairs, and of the subsequent conduct of his firm, in forwarding the bill to St. Louis before the maturity of the notes, and the remark in their letter that they did not endorse the bill, as they were selling it for another. These circumstances are consistent with the proposition of fact assumed in the instruction; and though they are susceptible of an entirely

different explanation, yet perhaps it would be going too far to say, as matter of law, that they afforded no ground of inference in the direction supposed by the defendant. We think, therefore, that the judgment ought not to be reversed on the ground that there was no evidence in the case to authorize the instruction. We say so, however, in reference to the peculiar issue arising under that instruction, and the form of the questions submitted to the jury, and not in respect to any different issue which may properly arise hereafter in cases of this description. There is a wide difference between suspicion and knowledge in respect to the subject-matter under consideration, and even as between the evidences of suspicion, and such as would show gross negligence on the part of a banker or business man when discounting or purchasing negotiable paper transferable by delivery. A person may often suspect in matters of business what in fact he does not believe, and experience teaches that he will sometimes suspect what he has no reason to believe, and that too when the evidences to excite suspicion are so slight that he himself would scorn to acknowledge them as the basis of his action in the premises. Evidence merely tending to show, as in this case, that a party, in acquiring a negotiable bill of exchange or promissory note, suspected the title of the holder at the time of the delivery, would clearly be insufficient to authorize the conclusion that he was guilty of gross negligence when the transfer was made, and it would hardly constitute an approach towards proof that he had knowledge that such holder, who was known to be dealing in such paper, and claimed the right to use it, was guilty of any breach of trust in passing it.

II. The more important question, whether the instruction was correct, remains to be considered; and in approaching that question it becomes necessary, in the first place, to ascertain what the instruction was, and to deduce from it the principle of commercial law which was applied to the case. It was somewhat peculiar in its language, and, in fact, contained two distinct propositions, differing essentially in certain aspects, and not entirely reconcilable with each other; and yet we cannot doubt that the Circuit Court, in giving the instruction to the jury, intended to apply the doctrine to the case, that the title of the holder of a negotiable bill of exchange acquired before maturity is not protected against prior equities of the antecedent parties to the bill, where it was taken without inquiry, and under circumstances which ought to have excited the suspicions of a prudent and careful man. Such was certainly the general scope of the instruction, especially its second proposition; and such, it may be presumed, was the general

principle intended to be embodied in the questions submitted to the jury. They have been so treated here in the oral argu ment for the plaintiff, and were treated in the same way in the printed argument filed for the defendant. Whether either or both of the questions, in the form in which they were submitted, were objectionable as involving a departure from the doctrine intended to be applied, it will not become necessary to inquire. One thing is certain—if the general principle cannot be sustained, there is nothing in the features of the departure from it, or the particular phraseology of the questions submitted, to benefit the defendant. Undoubtedly the same general idea pervaded the instruction, though the questions were submitted to the jury in different forms, in order to meet the different aspects of the evidence in the case. It was to the effect, that if the plaintiff had acquired the bill under the circumstances described in either branch of the instruction, then he had acted without due caution, and was not entitled to recover. All the other grounds of defence had been provided for in other prayers for instruction. This one was obviously prepared to raise the single question, whether the plaintiff had acted with due caution in acquiring the bill, and consequently assumed all the other requisites of a good title in favor of the plaintiff. The only question, therefore, arising under the instruction, is, whether the rule of commercial law applied to the case was correct. Bills of exchange are commercial paper in the strictest sense, and must ever be regarded as favored instruments, as well on account of their negotiable quality as their universal convenience in mercantile affairs. They may be transferred by endorsement; or when endorsed in blank, or made payable to bearer, they are transferable by mere delivery. The law encourages their use as a safe and convenient medium for the settlement of balances among mercantile men; and any course of judicial decision calculated to restrain or impede their free and unembarrassed circulation, would be contrary to the soundest principles of public policy. Mercantile law is a system of jurisprudence acknowledged by all commercial na-. tions; and upon no subject is it of more importance that there should be, as far as practicable, uniformity of decision throughout the world. A well-defined and correct exposition of the rights of a *bona fide* holder of a negotiable instrument was given by this court in Swift *v.* Tyson, (16 Pet., p. 1,) as long ago as 1842; and we adopt that exposition relative to the point under consideration on the present occasion, as one accurately defining the nature and character of the title to those instruments which such holder acquires when they are transferred to him for a valuable consideration. This court then said, and we

now repeat, that a *bona fide* holder of a negotiable instrument for a valuable consideration, without notice of facts which impeach its validity between the antecedent parties, if he takes it under an endorsement made before the same becomes due, holds the title unaffected by these facts, and may recover thereon, although, as between the antecedent parties, the transaction may be without any legal validity. That question was not one of new impression at the date of that decision, nor was it so regarded either by the court or the learned judge who gave the opinion; on the contrary, it was declared to be a doctrine so long and so well established, and so essential to the security of negotiable paper, that it was laid up among the fundamentals of the law, and required no authority or reasoning to be brought out in its support; and the opinion on that point was fully approved by every member of the court, and we see no reason to qualify or change it in any respect. Such being the settled law in this court, it would seem to follow as a necessary consequence from the proposition as stated, that if a bill of exchange endorsed in blank, so as to be transferable by delivery, be misappropriated by one to whom it was intrusted, or even if it be lost or stolen, and afterwards negotiated to one having no knowledge of these facts, for a valuable consideration, and in the usual course of business, his title would be good, and that he would be entitled to recover the amount. The law was thus framed, and has been so administered, in order to encourage the free circulation of negotiable paper by giving confidence and security to those who receive it for value; and this principle is so comprehensive in respect to bills of exchange and promissory notes, which pass by delivery, that the title and possession are considered as one and inseparable, and in the absence of any explanation the law presumes that a party in possession holds the instrument for value until the contrary is made to appear, and the burden of proof is on the party attempting to impeach the title. These principles are certainly in accordance with the general current of authorities; and are believed to correspond with the general understanding of those engaged in mercantile pursuits. The word notice, as used by this court on the occasion referred to, we think must be understood in the same sense as knowledge, and indeed that is one of its usual and appropriate significations. Where the supposed defect or infirmity in the title of the instrument appears on its face at the time of the transfer, the question whether a party who took it had notice or not, is in general a question of construction, and must be determined by the court as matter of law; and so it was understood by this court in Andrews *v.* Pond et al., (13 Pet., 65,) where it is said that

"a person who takes a bill which upon the face of it was dishonored, cannot be allowed to claim the privileges which belong to a *bona fide* holder. If he chooses to receive it under such circumstances, he takes it with all the infirmities belonging to it, and is in no better condition than the person from whom he received it." And the same doctrine was adopted and enforced in Fowler *v.* Brantly, (14 Pet., 318,) where, in speaking of a promissory note, so marked as to show for whose benefit it was to be discounted, this court held that all those dealing in paper "with such marks on its face, must be *presumed* to have *knowledge* of what it imported." (See Brown *v.* Davis, 3 Term., 80.)

Other cases of like character, where the defect appears on the face of the instrument, are referred to in the printed argument for the defendant as affording a support to the instruction under consideration; but it is so obvious that they can have no such tendency, that we forbear to pursue the subject. (Ayer *v.* Hutchins, 4 Mass., 270; Wiggin *v.* Bush, 12 John., 305; Cone *v.* Baldwin, 12 Pick., 545; Brown *v.* Tabor, 5 Wend., 566.)

But it is a very different matter when it is proposed to impeach the title of a holder for value, by proof of any facts and circumstances outside of the instrument itself. He is then to be affected, if at all, by what has occurred between other parties, and he may well claim an exemption from any consequences flowing from their acts, unless it be first shown that he had knowledge of such facts and circumstances at the time the transfer was made. Nothing less than proof of knowledge of such facts and circumstances can meet the exigencies of such a defence; else the proposition as stated is not true, that a party who acquires commercial paper in the usual course of business, for value and without notice of any defect in the title, may hold it free of all equities between the antecedent parties to the instrument. Admit the proposition, and the conclusion follows. And the question whether the party had such knowledge or not, is a question of fact for the jury, and, like other disputed questions of *scienter*, must be submitted to their determination, under the instructions of the court; and the proper inquiry is, did the party, seeking to enforce the payment, have knowledge, at the time of the transfer, of the facts and circumstances which impeach the title, as between the antecedent parties to the instrument? and if the jury find that he did not, then he is entitled to recover, unless the transaction was attended by bad faith, even though the instrument had been lost or stolen. Every one must conduct himself honestly in respect to the antecedent parties, when he takes ne-

*Goodman* v. *Simonds.*

gotiable paper, in order to acquire a title which will shield him against prior equities. While he is not obliged to make inquiries, he must not wilfully shut his eyes to the means of knowledge which he knows are at hand, as was plainly intimated by Baron Parke, in May *v.* Chapman, 16 Mee. and Wels., 355, for the reason that such conduct, whether equivalent to notice or not, would be plenary evidence of bad faith. Mere want of care and caution, which was the criterion assumed in the instruction, falls so far below the true standard required by law, which is knowledge of the facts and circumstances that impeach the title, that we feel indisposed to pursue the general discussion, and proceed to confirm the views we have advanced as to what the law is, by referring to some of the decisions in the English courts, from which, as an important source of commercial law, most of our own rules upon the subject have been derived.

The leading case, among the more modern decisions in that country, is that of Goodman *v.* Harvey, 4 Ad. and Ell., 870. That was a case in bank, on a rule *nisi*, which was made absolute. Lord Denman, in delivering judgment, said: "We are all of opinion that gross negligence *only* would not be a sufficient answer, where a party has given consideration for the bill; gross negligence may be evidence of *mala fides*, but it is not the same thing. Where the bill has passed to the plaintiff without any proof of *bad faith* in him, there is no objection to his title." That case was followed by Uther *v.* Rich, 10 Ad. and Ell., 784, which was also argued before a full court, and the same learned judge held that the only proper mode of implicating the plaintiff in the alleged fraud by pleading was to aver that *he had notice of it,* leaving the circumstances by which that notice was to be proved, directly or indirectly, to be established in evidence; and he further held, that an averment that the plaintiff was not a *bona fide* holder was not equivalent. According to the rule laid down in Goodman *v.* Harvey, which indubitably is the settled law in all the English courts, proof that the plaintiff had been guilty of gross negligence in acquiring the bill, ought not to defeat his right to recover; and if not, it serves to exemplify the magnitude of the error assumed in the instruction, that any facts and circumstances which would excite the suspicion of a careful and prudent man were sufficient to destroy the title. It is clear that one or the other of these rules must be incorrect; both cannot be upheld. Gross negligence is defined to consist of the omission of that care which even inattentive and thoughtless men never fail to take of their own property; and if such neglect would not defeat the right to recover—and clearly it would

not, unless attended by bad faith—it cannot require any farther reasoning to demonstrate that the instruction was erroneous. Several cases have been decided in England upon the same subject, and to the same effect, and the rule laid down in Goodman *v.* Harvey is now adopted and sanctioned by the most approved elementary treatises upon commercial law. (Raphael *v.* The Bank of England, 33 Eng. L. and Eq., 276; Stephens *v.* Foster, 1 Cromp., Mee., and Wels., 849; Palmer *v.* Richards, 1 Eng. L. and Eq., 529; Arbouin *v.* Anderson, 1 Ad. and Ell., N. S., 498; May *v.* Chapman, 16 Mee. and Wels., 355; Chitty on Bills, 12th ed., 257; Story on Bills, 3d ed., sec. 416; Byles on Bills, 4th Am. ed., 121 to 126; Smith's Mer. Law, ed. 1857, 255; Edwards on Bills, 309; 1 Saun. Plea. and Ev., 591; Wheeler *v.* Guild, 20 Pick., 545; Brush *v.* Scribner, 11 Conn., 368; Backhouse *v.* Harrison, 5 Barn. and Ad., 1098; Gwynn *v.* Lee, 9 Gill., 138.)

These cases, beyond controversy, confirm the rule laid down by this court in Swift *v.* Tyson, and they also furnish the fullest evidence, by their harmony each with the other, as well as by their entire consistency with the principal case, that the law has been uniform since the decision in Goodman *v.* Harvey, which was decided in 1836; and we think it will appear, upon an examination, that it has always been the same, at least from a very early period in the history of English jurisprudence down to the present time, except for an interval of about twelve years, while the doctrine prevailed which is now invoked in support of the instruction in this case. That doctrine had its origin in Gill *v.* Cubitt, 3 Barn. and Cress., 466, and it was followed by the other cases referred to in the printed argument for defendant. It was decided in 1824, and it is true, as the cases cited abundantly show, that it was *acquiesced in* for a time, as a correct exposition of the commercial law upon the subject under consideration. At the same time, it is proper to remark, that there is not wanting respectable authority that it had been much disapproved of before it was directly questioned; and it is certain, that nearly two years before it was finally overruled, Parke, Baron, in delivering judgment in Foster *v.* Pearson, regarded it as mere "dicta, rather than the decision of the judges of the King's Bench." (See Raphael *v.* The Bank of England, per Cresswell.) The reasons assigned for that departure from the long-established rule upon the subject are as remarkable and unsatisfactory as the change was sudden and radical, and yet their particular examination at this time is unnecessary. It is a sufficient answer to the case to say, that it has been distinctly overruled in the tribunal where it was decided, and has not been considered an authority in that court

for more than twenty years. The doctrine, says Mr. Chitty in his treatise on bills, is now completely exploded, and the old rule of law that the holder of bills of exchange, endorsed in blank and transferable by delivery, can give a title which he does not possess, to a person taking them *bona fide* for value, is again re-established in its fullest extent. It was not, however, accomplished at a single blow, but the error, so to speak, was literally broken up and destroyed by instalments. The foundation of the superstructure was severely shaken in Crook *v.* Jadis, 5 Barn. and Ad., 909, when the full bench first came to the conclusion that want of due care and caution were insufficient to constitute a defence, and that gross negligence, *at least*, must be shown, to defeat a recovery. But it was left to the case of Goodman *v.* Harvey to announce a complete correction of the error, when Lord Denman declared, we have shaken off the last remnant of the contrary doctrine.

A brief reference to some of the earlier cases will be sufficient to show that the decision in Gill *v.* Cubitt was a departure from the well-known and long-established rule upon the subject under consideration. One of the earliest cases usually referred to is that of Hinton's case, reported in 2 Show, 247. It was an action of the case against the drawer upon a bill of exchange payable to bearer. The court ruled that the holder must entitle himself to it on a consideration; "for if he come to be bearer by *casualty* or *knavery*, he shall not have the benefit of it;" and so in anonymous, 1 Salk., 126, where a bank note payable to A, or bearer, was lost, and found by a stranger, and by him transferred to C, for value. Holt, Ch. J., held that "A might have trover against the stranger, for he had no title to it, but not against C, by reason of the course of trade, which creates a property in the bearer." And again in Miller *v.* Race, 1 Burr, 462, where an inn-keeper received a bank note from his lodger in the course of business, and paid the balance, Lord Mansfield held he might retain it, as he came by it *fairly* and *bona fide*, and for value, and *without knowledge* that it had been stolen. And on a second occasion, in Grant *v.* Vaughan, 3 Burr, 1516, where a bill payable to bearer was lost, and the finder passed it to the plaintiff, the same court left it to the jury to find whether he came t. the possession *fairly* and *bona fide*. But a still stronger case is that of Peacock *v.* Rhodes, 2 Doug., 633, where a bill of exchange, endorsed in blank, was stolen and passed to the plaintiff by a man not known. It was argued for the defendant, that a holder should not *in prudence* take a bill unless he knew the person. Lord Mansfield answered, "that the law is well settled, that a holder coming *fairly* by a bill has nothing to do with the transaction between

the original parties. * * * The question of *mala fides* was for the consideration of the jury." And lastly, and to the same effect, is Lawson *v.* Weston et al., 4 Esp. R., 56, where a bill of exchange for £500 was lost or stolen, and was discounted by plaintiff for a stranger. It was insisted for the defendant, that "a banker or any other person should not discount a bill for one unknown, without *using diligence* to inquire into the circumstances." Lord Kenyon replied, that "to adopt the principles of the defence would be to paralyze the circulation of all the paper in the country, and with it all its commerce; that the circumstance of the bill having been lost, might have been material, *if they could bring knowledge of that fact home to the plaintiff.*" The cases cited, commencing in 1694 and ending in 1801, are sufficient to show what the state of the law was in 1824, when Gill *v.* Cubitt was decided, especially as the judges of the King's Bench, in giving their opinions on that occasion, did not pretend that there were any later decisions in which it had been modified.

III. But, assuming that the instruction was erroneous, it is still insisted, by the course of the argument for the defendant, that it was immaterial; and the argument proceeds upon the ground that the case, as made in the bill of exceptions, shows that the plaintiff was not the holder of the bill for a valuable consideration, in the usual course of business. On the contrary, it is insisted that he held it merely as a collateral security for a pre-existing debt, without any present consideration at the time of the transfer, and that a party who takes negotiable paper under such circumstances does not acquire it in the usual course of business, and consequently takes it subject to prior equities. Whatever may be our impressions in a case like the one supposed, we think the question does not arise in the present record, assuming the facts to be as they are exhibited in the bill of exceptions; and the answer to the argument will be based entirely upon that assumption, without prejudice to what may hereafter appear. When the settlement was made, the new notes were given in payment of the prior indebtedness, and the collaterals previously held were surrendered to the defendant, and the time of payment was extended and definitively fixed by the terms of the notes, showing an agreement to give time for the payment of a debt already over-due, and a forbearance to enforce remedies for its recovery; and the implication is very strong, that the delay secured by the arrangement constituted the principal inducement to the transfer of the bill. Such a suspension of an existing demand is frequently of the utmost importance to a debtor, and it constitutes one of the oldest titles of the law under the head of forbearance, and

has always been considered a sufficient and valid consideration. (Elting *v.* Vanderlyn, 4 John., 237; Morton *v.* Burn, 7 Ad. and El., 19; Baker *v.* Walker, 14 Mee. and Wels., 465; Jennison *v.* Stafford, 1 Cush., 168; Walton *v.* Mascall, 13 Mee. and Wels., 453; Com. Dig., action assumpsit, B. 1; Wheeler *v.* Slocum, 16 Pick., 62; Story on Prom. Notes, sec. 186, and cases cited.) The surrender of other instruments, although held as collateral security, is also a good consideration; and this, as well as the former proposition, is now generally admitted, and is not open to dispute. (Dupeau *v.* Waddington, 6 Whar., 220; Hornblower *v.* Proud, 2 Barn. and Ald., 327; Rideout *v.* Bristow, 1 Cromp. and Jer., 231; Bank of Salina *v.* Babcock, 21 Wend., 499; Youngs *v.* Lee, 2 Ker., 551.) It seems now to be agreed, that if there was a present consideration at the time of the transfer, independent of the previous indebtedness, that a party acquiring a negotiable instrument before its maturity as a collateral security to a pre-existing debt, without knowledge of the facts which impeach the title as between the antecedent parties, thereby becomes a holder in the usual course of business, and that his title is complete, so that it will be unaffected by any prior equities between other parties, at least to the extent of the previous debt, for which it is held as collateral. (White *v.* Springfield Bank, 3 Sand. S. C., 222; New York M. Iron Works *v.* Smith, 4 Duer, 362.) And the better opinion seems to be, in respect to parol contracts, as a general rule, that there is but one measure of the sufficiency of a consideration, and, consequently, whatever would have given validity to the bill as between the original parties is sufficient to uphold a transfer like the one in this case. We are not aware that the principle, as thus limited and qualified, is now the subject of serious dispute anywhere, and that is amply sufficient for the decision of this cause. Whether the same conclusion ought to follow where the transfer was without any other consideration than what flows from the nature of the contract at the time of the delivery, and such as may be inferred from the relation of debtor and creditor in respect to the pre-existing debt, is still the subject of earnest discussion, and has given rise to no small diversity of judicial decision. It seems it is regarded as sufficient in England, according to a recent case. (Poirier *v.* Morris, 20 Eng. L. and Eq., 103; Byles on Bills, pp. 96 and 127.) A contrary rule prevails in New York, as appears by several decisions. (Coddington *v.* Bay, 20 John., 637; Stalker *v.* McDonald, 6 Hill, 93; and also in Tennessee, Napier *v.* Elam, 5 Yerg., 108.) It is settled that it is a sufficient consideration, in Massachusetts, Vermont, and New Jersey, and such was the opinion of the late Justice Story, as appears from his remarks

in Swift *v.* Tyson, and in his valuable treatise on Bills of Exchange. (Stoddard *v.* Kimball, 6 Cush., 469; Story on Bills, sec. 192; Chicopee Bank *v.* Chapin, 8 Met., 40; Blanchard *v.* Stevens, 3 Cush., 162; Atkinson *v.* Brooks, 26 Ver., 569; Allaire. *v.* Hartshorne, 1 Zab., 665.) We think, however, that the point does not arise in this case, for the reasons before stated, and, consequently, forbear to express any opinion upon the subject. The judgment of the Circuit Court is reversed, and the cause remanded for further proceedings, with directions to issue a new venire.