## MURRAY et al. v. WAGNER et al.

(Circuit Court of Appeals, Second Circuit.   November 16, 1921.)

No. 46.

1. **Pleading ⊗⟶236 (4)—Court has discretion to permit amendment after proofs.**

It was within the discretion of the trial court to permit an amendment of the complaint to be made after all the testimony had been taken.

2. **United States ⊗⟶89—Purchaser of stolen notes without knowledge gets title.**

A purchaser of negotiable Victory Notes, which had previously been stolen from the owner, is entitled thereto as against the one from whom they were stolen, if he had no notice of the defects in the title.

3. **United States ⊗⟶89—Purchaser from bond broker is not put on inquiry as to title.**

A purchaser of negotiable Victory Notes from one who was in the business of selling such securities is not put on inquiry as to defects in the title to the bonds by knowledge that the broker was selling them for another, since the rule that an agent cannot pass title is subject to exception, where the property consists of money or negotiable paper under Negotiable Instruments Law N. Y. § 91, and where the principal intrusts the possession of his goods to one whose business it is to sell similar property, either as the owner or as the agent of the owner.

4. **United States ⊗⟶89—Notice of defect of title to notes must do more than raise suspicion.**

Under Negotiable Instruments Law N. Y. § 95, providing that notice of defect in the title must be actual knowledge of the defect, or knowledge of such facts that the taking of the instrument amounted to bad faith, a suspicion of defect of title or the knowledge of circumstances which would excite such suspicion, or even gross negligence by the taker, does not amount to knowledge of the defect, which defeats his title, so that mere knowledge that the seller of Victory Notes was a broker selling them for another does not defeat the title of the purchaser.

In Error to the District Court of the United States for the Southern District of New York.

Action by Emil W. Wagner and others, copartners doing business under the firm name and style of E. W. Wagner & Co., against James Murray, as Property Clerk of the Police Department of the City of New York, and others.   Judgment for plaintiffs, and defendants bring error.   Affirmed.

The judgment below was in favor of plaintiffs there, who are defendants in error here.   The parties will be referred to as they were aligned below.

Wherry & Mygatt, of New York City (Frederick E. Mygatt and William M. Wherry, Jr., both of New York City, of counsel), for plaintiffs in error.

Hays & Wadhams, of New York City (Arthur Garfield Hays, of New York City, and John Schulman, of Brooklyn, N. Y., of counsel), for defendants in error.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

⊗⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

MAYER, Circuit Judge. The action is for conversion of 25 $1,000 4¾ Victory Notes of the United States, which, in August, 1919, were owned by Whitney & Co., defendants below. Murray, the property clerk of the New York police department is a formal defendant. These notes were stolen from Whitney & Co. on August 13, 1919. Plaintiffs were stockbrokers having offices in various cities throughout the United States. One of these offices was in the Hollenden, one of the principal hotels in Cleveland, Ohio, and in charge of one Graves. One Samuel Ginsberg was the proprietor of a small cigar store across the street from the Hollenden Hotel. Ginsberg was licensed to deal in securities in accordance with the so-called Blue Sky Law of Ohio [1] from September 12, 1919, and this license was existent on October 16, 1919. Graves, who had known Ginsberg for some time, sold him some copper stock in July, 1918, and thereafter, and until October 16, 1919, had several transactions with him. Graves bought from Ginsberg Liberty Bonds on January 20, 1919, Victory Notes on September 8, 1919, and Victory Notes and Liberty Bonds on September 30, 1919—all aggregating $17,050. These transactions were never questioned. Prior to October 16, 1919, Graves had been told that Ginsberg was a licensed broker, and was handling Liberty Bonds, and had sold bonds to another reputable brokerage house in Cleveland.

On the morning of October 16, 1919, Ginsberg went to Wagner & Co.'s office, saw Graves, and told him that he had $25,000 Victory 4¾'s, which he would like to sell. Graves asked him whether he wanted them sold "at the market," to which Ginsberg answered, "Yes." In accordance with the practice of the Wagner firm, Graves sent an order to New York over the private wire to Wagner's New York correspondent, Josephthal & Co., "Sell twenty-five thousand Victory 4¾'s at the market." Within a few minutes, Josephthal & Co. wired back that they had sold the notes at 99.72. Meanwhile Graves had instructed Drapes, the cashier of Wagner & Co., to check up the notes. This was, apparently, an ordinary and usual precaution and instruction. Drapes had lists of stolen bonds, showing the numbers. These lists were obtained from the Federal Reserve Bank in Cleveland and other sources. Drapes did not find the numbers of these notes on any of the lists, and so reported to Graves. Thereupon Drapes figured out what was due Ginsberg, wrote out a check to Ginsberg's order on the Guardian Savings & Trust Company of Cleveland for $25,379.42, and delivered the check to Ginsberg. Wagner & Co. received about $18 for the transaction, which was regarded by Graves as broker's commission.

The fact that the notes in question had been stolen from Whitney & Co. in August, 1919, was not known to Graves. After the check was delivered to Ginsberg, he left the Wagner office. He returned, however, in a few minutes with the check, and said to Graves:

"Will you go to your bank and identify me? * * * I am not known over there. * * * I want to get the cash on this check."

Thereupon Graves said:

"Why, yes; I can do that."

[1] Gen. Code, §§ 6373—1 to 6373—24.

277 F.—3

He further testified:

"I think I asked him why he wanted the cash, and he said the client that he sold the securities for had to have currency."

Graves then identified Ginsberg at the bank, and for that purpose also indorsed the check. After Graves left the bank, Ginsberg cashed the check. That night the notes were sent by Wagner & Co. to Josephthal & Co. for delivery to the purchasers, who were Sutro & Kimbley. When they were presented by the latter firm to the Federal Reserve Bank for exchange for other securities, the notes were held, and then delivered to the New York police department as stolen property. Murray, the property clerk, delivered them to Whitney & Co., who claimed them as owners. Upon application of Sutro & Kimbley, the Stock Exchange decided that, since a dispute had arisen about the title, Wagner & Co. should reimburse Sutro & Kimbley and should establish title to the notes. Wagner & Co. received from Sutro & Kimbley the receipt given by the police department, together with an assignment to them of all the right, title, and interest in the receipt and in the notes. Wagner & Co. made an unsuccessful demand for the bonds on Whitney & Co., and hence brought this action.

The complaint alleged that the notes were purchased by Wagner & Co. from Ginsberg in the regular course of business; but, on the trial, it was apparent that the pleader, in so alleging, was under a misapprehension, as the proofs showed that Wagner & Co. acted as brokers, and sold the notes as above described, and received only a broker's commission. When all the testimony had been taken, counsel for Wagner & Co. moved to amend the complaint. This motion was somewhat informal in its phraseology, but it was clear enough to demonstrate that it was then alleged that Wagner & Co. were then the holders and owners of the notes, and had therein a special property right, in that they held these notes as security for the advance made to Ginsberg. After some colloquy, it was plain that counsel for Whitney & Co. did not press his objection to the amendment. On the contrary, he proposed that the court should leave to the jury two questions as follows:

(1) Did Wagner & Co. on October 16, 1919, advance to Samuel Ginsberg the sum of $25,379.48 on the security of the 25 Victory Bonds?

(2) If you answer "Yes" to the first question, then did Wagner & Co. act in this transaction with good faith?

Then counsel said:

"Now, if your honor will leave those two questions to the jury, to answer 'Yes' or 'No,' why, then, upon the findings, you can direct a verdict, which will never require another trial."

The jury answered each question in the affirmative, and thereupon the court directed a verdict in favor of plaintiffs.

[1] In the third assignment of error, defendants do not complain of the nature of the amendment, but merely that the court, "after defendants had moved for a dismissal of the complaint, allowed the plaintiffs to amend their complaint." The allowance of the amendment at that time was well within the court's discretion, and hence was not error.

[2] Up to the time when Ginsberg delivered the notes and received the check, there was nothing in the testimony which would have justified a verdict in favor of defendants. So much apparently is admitted by counsel for defendants, when they state in their brief:

"If Ginsberg had not disclosed his agency, the situation would have been wholly different. * * * "

In Crittenden v. Widrevitz (C. C. A.) 272 Fed. 871, recently decided by this court, the court sustained a directed verdict on facts less favorable to the purchaser of the stolen bonds than those which appear in this case prior to the conversation about cashing the check. Whether or not the transaction, as between Graves, acting for Wagner & Co., and Ginsberg, was completed when Graves delivered the check, we need not determine.

[3] The question is whether what Ginsberg said to Graves was notice of defect of title, in that Ginsberg was not the owner, but was acting for another, and thus that Wagner & Co., as matter of law, did not become owners and holders in good faith without notice. It is true, of course, that ordinarily possession by an agent is as consistent with agency as with ownership, and therefore, as against the true owners, an agent cannot pass title. But to this rule, as said by Mechem on the Law of Agency (2d Ed.) § 2110:

"There are two exceptions made. One relates to the case in which the property in the agent's possession consists of money or of negotiable paper; the other, to the case in which the principal intrusts the possession of his goods to one whose business it is to sell similar property, either as the owner or as the agent of the owner."

The first exception has been codified by the Negotiable Instruments Law (Consol. Laws, c. 38) of New York (section 91) and by the Ohio General Code (section 8157). The second exception is thus well expressed by Mechem (section 2112):

"If a man voluntarily delivers his property into the customary business possession of one, like an auctioneer, broker, or factor, whose ordinary business it is to sell similar property as the agent of the owners, it is said to be a warrantable inference, in the absence of anything to indicate a contrary intent, that he intends his property to be sold also."

As stated, supra, Ginsberg was a duly licensed broker, authorized under the laws of Ohio to deal in this class of securities, and that fact had come to the attention of Graves prior to the transaction here concerned. There was, therefore, no duty per se upon Graves to refuse to identify Ginsberg at the bank, nor to order the payment on the check stopped.

[4] What constitutes notice of defect of title in respect of negotiable instruments, as in many cases defined, has been simply and clearly stated in section 95 of the New York Negotiable Instruments Law, as follows:

"Section 95. *What Constitutes Notice of Defect.* To constitute notice of infirmity in the instruments or defects in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

See, also, Page & Adams Annotated Ohio General Code, § 8161, which is identical with section 95, supra.

Another way of stating the proposition is very well set forth in Bank v. Ohio Valley Furniture Co., 57 W. Va. 625, 630, 50 S. E. 880, 881 (70 L. R. A. 312). In that case, on the facts, the bank to which the notes were sold knew that the agent was acting in derogation of his principal's rights. The court, however, in its opinion said, inter alia:

"The settled law of the country now is that, despite suspicion of defect of title or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker, at the time of the transfer, a party who takes a negotiable instrument before it is due for a valuable consideration, without knowledge of any defect of title in good faith, obtains a good and indefeasible title thereto."

See Goodman v. Simonds, 20 How. 343, 15 L. Ed. 934; Murray v. Lardner, 69 U. S. (2 Wall.) 110, 17 L. Ed. 857; Swift v. Smith, 102 U. S. 442, 26 L. Ed. 193; Crittenden v. Widrevitz, supra.

As Ginsberg was an authorized broker, it cannot be said that, as matter of law, Graves was charged with actual knowledge of any infirmity or defect in the title of the notes. Whether Graves had "knowledge of such facts that his action in taking the instruments amounted to bad faith" was regarded below as a question of fact, and, in effect, submitted to the jury after a clear and comprehensive charge.

In view of the jury's answer, it is unnecessary to consider whether plaintiffs would have been entitled to a directed verdict.

Judgment affirmed.