## ANGLE *v.* NORTH-WESTERN MUTUAL LIFE INSURANCE COMPANY.

1. Where a party to a negotiable instrument intrusts it to another for use as such with blanks not filled, it carries on its face an implied authority to complete it by filling them, but not to vary or alter its material terms by erasing what is written or printed as a part thereof, nor to pervert its scope or meaning by filling the blanks with stipulations repugnant to what was plainly and clearly expressed in the instrument.
2. It is a principle of universal application, that the material alteration of a written instrument renders it void.

APPEAL from the Circuit Court of the United States for the District of Iowa.

*Mr. George G. Wright* for the appellant.

*Mr. C. C. Nourse, contra.*

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Persons dealing with an agent are entitled to the same protection as if dealing with the principal, to the extent that the agent acts within the scope of his authority.

Pursuant to that rule, it is settled law, that where a party to

a negotiable instrument intrusts it to another for use as such, with blanks not filled up, such instrument so delivered carries on its face an implied authority to complete the same by filling up the blanks; but the authority implied from the existence of the blanks would not authorize the person intrusted with the instrument to vary or alter the material terms of the instrument by erasing what is written or printed as part of the same, nor to pervert the scope and meaning of the same by filling the blanks with stipulations repugnant to what was plainly and clearly expressed in the instrument before it was so delivered.

By virtue of the implied authority, such a depositary may perfect, in his discretion, what is incomplete, by filling the blanks; but he may not make a new instrument by erasing what is written or printed, nor by filling the blanks with stipulations repugnant to the plainly expressed intention of the same as shown by its written or printed terms.   *Goodman* v. *Simonds*, 20 How. 361; *Bank* v. *Neal*, 22 id. 108.

Much reference to the pleadings will be unnecessary, as the questions presented for decision arise chiefly out of the facts deducible from the proofs exhibited in the record.   Suffice it to say, in that regard, that the suit was instituted by the complainant to procure a decree that the bond and mortgage and the two fire-insurance policies described in the bill of complaint were delivered and assigned to the respondents without consideration, and to obtain a decree setting aside said bond and mortgage, and for a return of said policies, the same having been delivered to the respondents as additional security for a loan of ten thousand dollars, the proceeds of which never came to the hands of the complainant; and he charges that the proceeds of the loan were never forwarded to him by his authority; that if the insurance company ever paid the same in current funds to the person through whom the loan was negotiated upon any order signed by him, as pretended by the respondents, the order was forged by the party who presented it, or by some person interested, to cheat and defraud the complainant out of the money.

Service was made, and the corporation respondents appeared and filed an answer, in which they allege that the bond, mort-

gage, and fire policies were duly delivered to the company by the agent of the complainant; and they deny that the order for the payment of the proceeds of the loan was forged, and aver that they made the payment to the person who presented it, in good faith.   Proofs were taken; and the court, having heard the parties, entered a decree dismissing the bill of complaint, and the complainant appealed to this court.

Sufficient appears to show that the respondents are a corporation created by the laws of Wisconsin, and that they were doing a life-insurance business throughout the North-western States; and it also appeared that they were accustomed to loan money on real-estate securities.   Agents were appointed by the respondents, in the different States, whose duty it was to solicit applications for policies, and to transact other matters connected with their insurance business.

State agents were appointed by the company; but it is conceded that they in turn appointed sub-agents to perform the same duties, and it appears that the commissions for all such services were paid by the company to the State agents.

Applications for loans of money were frequently made to the company through the State agents; and it appears that such agents of the company were furnished with blank forms for such applications, and for the appraisement of real estate intended as security for such loans.   When an application for a loan was made, the blank forms were filled up by the agent. It was the business of the borrower to furnish abstracts of the title of the real estate offered as security, all of which were transmitted by the agent to the home office for examination; and, if they were approved, the course of business was that the bond and mortgage were prepared and forwarded to the agent, to be delivered to the applicant for execution and return.

Of course, the applicant might still refuse to execute the bond and mortgage; but if he was satisfied with the terms of the instruments, and completed the same, they were given back to the agent, and were by him returned to the company.   It seems that the money loaned was usually transmitted to the applicant by means of a draft payable to the order of the borrower; or, in certain cases, the money was paid by the company at the home office, pursuant to the written order of the borrower,

evidenced by a receipt on the back of the order by the person in whose favor it was drawn. Such papers from the home office to the borrower and from the borrower to the company, it is conceded, are usually mailed to the State agent, and that they pass through his office; but it is insisted by the respondents that he has no interest in the business, and that he receives no compensation from the company for his services.

Sub-agents, it is conceded, were employed by the agents appointed by the company; and it appears that I. T. Martin, during the winter and spring of 1871, was a regular agent of the company, appointed for the State of Iowa; that he employed one C. W. Copeland, as sub-agent, to solicit applications for life insurance; that Copeland claimed to be the agent of the company to effect loans in their behalf on security of real estate; and that he represented to the complainant that he, the sub-agent, could procure for the complainant a loan from the company of $10,000 on such security.

Both the complainant and Copeland then resided at Cedar Rapids, and it was at that place and about that time that the former was introduced to the latter; and it appears that Copeland was at that time canvassing for the company, to procure customers to take policies in the company, and to induce persons to take loans from the company on security of real estate. About the same time, Copeland published a card in one or more of the local newspapers, representing that he was the agent of the company; and it appears that he exhibited to the complainant pamphlets, circulars, and other documents, of the kind prepared and distributed by the State agents, as the means of extending the business of the company, and that notice was published by the same party in one or more of the local journals, in which he is described as the agent of the insurance company.

Evidence entirely satisfactory was introduced, showing that it was during that period that the complainant commenced negotiations with Copeland to obtain for him a loan from the company for the sum of $10,000, to be secured by bond, and mortgage of real estate. Conversation ensued between them; and the evidence shows that Copeland told the complainant that he was going to quit preaching, and that he had made arrangements to act as attorney for the said insurance com-

pany; that he had already secured a loan for one person; and that, being an intimate friend of the general agent, he could get the money whenever he recommended a loan.

Blank forms were requisite; and it appears that Copeland furnished the complainant with a printed blank form of an application for a loan, and that he requested the complainant merely to insert the description of the property to be offered as security and his valuation of the same, stating that he, the agent, would fill the other blanks, and send the application forward. Accordingly, the complainant inserted the description of the property, giving his valuation of the same in figures, and also gave the name of his wife and the date of the instrument, and his own name, and place of residence. Incomplete though the instrument was, yet the witness states that he delivered it to Copeland, and that he, the witness, never saw it afterwards until he gave his deposition in the case, and that the indorsements on the back of the instrument were not there when it left his possession.

Due notice was received by the complainant, from the president of the company, that his application for the loan was accepted; and he was also informed, in the same communication, that abstracts of the title of the property and certain certificates were required to show that the property was free of incumbrances and liens, and that when the same were received, if found to be correct, their attorney would prepare the bond and mortgage, and forward the same to him for execution.

Such abstracts and certificates were procured by the complainant, at the instance of Copeland, and they were delivered by the complainant to him at his request; and it appears that Copeland presented to the complainant the bond and mortgage, ready for his signature, he having procured the signature of the complainant's wife to the mortgage before the instruments were exhibited to the complainant for execution. They were signed by the complainant at his house, no one being present except his wife and Copeland; and the complainant testifies that he then and there delivered the same to Copeland, together with two fire policies of insurance, in order that the fire policies might be indorsed by the agent of the companies

issuing the same, in a way to make the loss, if any, payable to the corporation respondents. Decisive proof that Copeland received the bond and mortgage for record and transmission is also exhibited by the receipt which he gave in behalf of the company, and which he signed as agent.

Throughout the whole transaction, the negotiations with the complainant were conducted by Copeland; and the evidence shows beyond doubt that all the instruments and documents which were delivered by the complainant to Copeland were by him delivered or transmitted to the State agent of the company, and that they were all forwarded by the latter to the company at their home office, where the officers of the company transact all their business.

Such applications for loans are usually made direct to the executive committee, and are required to be signed by the party desiring the loan; and, when the loan papers have been perfected, the company pay to the owner directly, either in checks or drafts *to his order*, unless the borrower, by written request or order, may have otherwise directed: but the president, in his testimony, admits that the State agent sometimes forwards applications to the executive committee for parties residing in the State, and that the home office does advise such parties, through him, of the action of the company in respect to such applications. Cases of the kind, therefore, it may be assumed, had occurred before, where the business was transacted through the State agent; but, if not, still it is proved beyond all doubt that all the negotiations with the complainant were conducted by the sub-agent, and that all the propositions to and from the company, in respect to the loan in question, were transmitted to the company through the same State agent.

Satisfactory abstracts and certificates having been forwarded, and the due execution and delivery of the bond and mortgage having been procured, nothing remained to be done to enable Copeland to carry his fraudulent scheme into effect, except to get an order for the money in such a form that he could convert the fund to his own use, without danger of immediate exposure and detection. Antecedent conversations between the parties made it known to him that the complainant expected to receive

the proceeds in drafts payable to his own order; it appearing that the complainant had told him that he wanted the amount in two drafts, one for $6,000 and the other for $4,000, each payable to his own order. Apprised of what the complainant desired, he doubtless thought it prudent to seem to conform to his expressed wish. Circumstances occasioned some delay: but Copeland finally informed the complainant that the papers had gone forward, and stated that notice that the papers were satisfactory might come any day, and suggested that the complainant might as well sign the blank order for the money, adding that he " would fill it out; " and the witness testifies that he looked at the blank, and, seeing that it contained the words " in drafts to the order of," put his signature to it, placed it in the drawer of Copeland, and went home.

Taken as a whole, the evidence satisfies the court, beyond all doubt, that the blank form which the complainant signed was without date, except the year, which was in printed figures; that it contained no direction except the printed word " to," followed by a blank; that it did not contain the name of any payee, nor any thing upon the subject, except the printed words " pay to," followed by a blank; that it did not specify any amount, nor contain any thing upon the subject, except the printed word " dollars," preceded by a blank; that it did not specify for what the payment was to be made, nor did it contain any thing upon the subject, except the printed words " on account of," followed by a blank; and that it contained nothing in respect to the medium of payment, except the printed words " in drafts to the order of," the word " of " immediately preceding the name of the plaintiff, H. G. Angle, and so close to the first initial of the signature as to leave no blank between the erased sentence and the name of the complainant.

Subsequent to the time when the blank form was signed by the complainant, and was left in the drawer of Copeland, the printed words " drafts to the order of," just preceding the signature of the complainant, were erased, evidently with pen and ink, and the words " current funds " were inserted in writing between the printed word " in " and the word " drafts," which is the first word of the sentence " drafts to the order of," the effect of which was to authorize the company to pay

the proceeds of the loan "in current funds," instead of "drafts to the order of " the signer of the blank form.

Armed with that instrument, the blanks having been filled, and the words " current funds " having been inserted, in lieu of the words " drafts to the order of," which were erased, Copeland went to the home office and obtained the whole proceeds of the loan, and absconded with the whole amount.

Full power to receive the proceeds of the loan would have been conferred upon the person who presented it, even if the holder of the blank form had done nothing more than to fill the blanks contained in the incomplete instrument; but it is quite obvious, that, if he had merely filled the blanks of the instrument, the company would have been obliged to make the payment " in drafts to the order of " the complainant, which, it is easy to see, would have defeated the fraudulent intent of the party who presented it for payment, as the drafts, if payable to the order of the complainant, could not be by that party converted into current funds. Had he merely filled the blanks, the body of the completed instrument would have read as follows; to wit: " Pay to [the person named] ten thousand dollars, on account of bond and mortgage, in drafts to the order of H. G. Angle." Evidently such an instrument would not have answered the purpose of the holder of the blank form, if he intended to betray his trust, and to convert the proceeds of the loan to his own use, without the consent of the lawful owner of the fund.

Blanks necessary to complete the instrument and render it operative, it may be admitted, might be filled by the holder of the instrument; but it is clear that it was not possible, within the meaning of that rule, to give the instrument such a form as would make it answer the supposed fraudulent intent, without doing violence to the scope and design of the blank form, as evidenced by the printed terms it contained, which, as outlines, plainly indicate that the signer required that the payment of the proceeds of the loan should be made in drafts to his own order. Manifest as that indication was, and as it would be, even to the casual reader, it became necessary, in order to make the completed instrument answer the fraudulent intent of the holder, to change the scope and design of the same,

which he effectually accomplished by erasing the printed words "drafts to the order of," which immediately preceded the name of the signer, as before explained, and by inserting the words "current funds" between the erased word "drafts" and the word "in," between which and the erased word "drafts" there was a short blank, scarcely sufficient to admit the written words "current funds," as will be seen by reference to the instrument actually presented to the company, which was sent up with the transcript as an original paper.

Compare the altered instrument with what it would have been if nothing had been done to it except to fill the blanks, and the criminal character of the act is manifest. By the erasure and insertion of the words "current funds," it was made to read as follows: "Pay to [the person named] ten thousand dollars, on account of bond and mortgage, in current funds."

Such an alteration, it is insisted by the complainant, is not and cannot be justified by any implication which arises from the existence of blanks in the instrument, inasmuch as the alteration consists both of the erasure of material words and the insertion of other material words in lieu of those erased, which change the scope and legal effect of the instrument from what it would have been if the blanks had been filled without any such erasure and insertion.

Complainant concedes that blanks in such an instrument may be filled by the person to whom it is intrusted for use; but he contends that the said alterations made in the instrument in this case were a forgery, which renders the completed instrument void; and the court here concurs in that proposition.

Negotiable instruments are frequently delivered for use, with blanks not filled; and, in respect to such instruments, it is held, that where a party to such an instrument intrusts it to the custody of another for use, with blanks not filled up, whether it be to accommodate the person to whom it was intrusted or to be used for the benefit of the signer of the same, such negotiable instrument carries on its face an implied authority to fill up the blanks necessary to perfect the same; and the rule is, that, as between such party and innocent third parties, the person to whom the instrument was so intrusted must be

deemed the agent of the party who committed the instrument to his custody, in filling the blanks necessary to perfect the instrument. · *Violet* v. *Patton*, 5 Cranch, 142; *Russell* v. *Langstaffe*, 2 Doug. 514; *Collis* v. *Emmet*, 1 H. Black. 313; *Montague* v. *Perkins*, 22 Eng. L. & Eq. 516.

Questions of the kind most frequently arise in respect to negotiable instruments; but the court here is of the opinion that the same rule is properly applicable to the case before the court. Authority to act for another may be express, or it may, in certain cases, be implied; but an implied authority has its limitations as well as that which is express. Examples to prove that proposition exist everywhere; but it would be difficult to give one more apposite and striking than the one presented by the case in decision, where the authority to fill blanks is implied from their existence in an instrument intrusted to another for use. 1 Greenl. Ev. (12th ed.), sect. 567.

Beyond all doubt, such a party may fill every blank which it is necessary should be filled to perfect the instrument and render it operative, within its scope and design, if the terms or words of the instrument sufficiently indicate what that scope and design are. Cases arise, it must be conceded, where a party signs his name to a blank paper, and intrusts the paper containing his signature to another for use; but it is sufficient to say upon the subject, that the case before the court is not of that character. Instead of that, the blank form signed by the complainant contained terms clearly indicating that the money was to be paid on account of "the bond and mortgage," and that the signer of the blank form required the payment to be made "in drafts to the order of" the signer of the same; and it was no more competent for the person to whom it was intrusted, in that state of the case, to erase the words "drafts to the order of," and to insert in the short blank preceding that sentence the words "current funds," than it would have been for that person to have prepared and executed a new instrument in the name of the signer, requesting the company to pay the proceeds to the order of the holder of the blank form.

Argument is scarcely necessary to support that proposition, as it is self-evident that the erasure of the words "drafts to the order of" changed the manifest scope and design of the incom-

plete instrument; and it is equally clear that the words "current funds," which were inserted, are utterly repugnant to the printed terms "drafts to the order of," which were erased by black lines. *Bank* v. *Douglas*, 31 Conn. 180.

Properly applied, that case is decisive of the present case. It appears that the defendant in that case put his name upon an inchoate bill of exchange, drawn and signed by the maker, on a certain firm, blanks being left for the date, amount, time of payment, and the name of the payee; and that the defendant delivered the paper, thus indorsed, to the maker of the same, who struck out the name of the place where it was made, and the name of the firm on which it was drawn, and filled out the instrument, so as to make it a promissory note for $3,500, payable to the order of another party. Upon these facts the court held that an inference arose, — which, in favor of a *bona fide* holder of the paper, was irresistible, — that the person to whom the paper was intrusted was authorized, by filling the existing blanks, to complete the instrument and to fill the blanks so as to bind the defendant as indorser of a bill of exchange, drawn by him on the firm therein named, for any sum, payable at any time and place. But, say the court, no inference, or presumption of authority, can arise that he might turn the bill drawn on one firm into a bill drawn on another, or to turn it into a promissory note. Neither *dictum* nor decision, say the court, has been cited to warrant such a claim; and they add, that they suppose that none such can be found. Suit in that case was brought by the bank, claiming to be an innocent holder; but the court held, that, notwithstanding the erasures, unmistakable evidence of the original character of the instrument remained, and that the evidence was amply sufficient to excite distrust, and make it the duty of any one to whom the paper was offered to inquire when and by what authority such erasures and alterations had been made. *Gardner* v. *Walsh*, 32 Eng. L. & Eq. 162.

Where blanks exist in negotiable securities, delivered to another for use, the custody of the paper, under such circumstances, gives the custodian the right to fill the blanks; but it does not confer authority to make any addition to the terms of the note; and if any such of a material character are made by such a party, without the consent of the party from whom the

paper was received, it will avoid the note, even in the hands of an innocent holder.   *Ivory* v. *Michael*, 33 Mo. 400.

Proof was given in that case that the parties had for many years been in the habit of indorsing for each other; that the defendant indorsed the note, which was in blank, as to the time of payment, and was payable without defalcation or discount. Before using it, the other party filled the blank with thirty days, and added, after the word "discount," "bearing ten per cent after maturity."   Attempt was made in argument to sustain the right to make the addition to the note, because it was delivered before the blank was filled; but the court held that the insertion of the words, "bearing ten per cent after maturity," was not the filling of a blank, and that it rendered the note invalid.   *Wood* v. *Steele*, 6 Wall. 80.

Persons intrusted with negotiable securities for use by the parties to it may, if it contains blanks, fill the same: but Mr. Parsons, though he admits that rule to its fullest extent, adds, that, if one materially changes words which are printed or written, the note by such change would be rendered invalid; and certainly it must be so if the change substantially varies the scope of the instrument, to the prejudice of the party from whom it was obtained.   2 Pars. on Bills & Notes, 566.

Suppose that is so: still it is insisted by the respondents that the rule is not applicable in this case, because they had not notice of the defect in the blank order.   But the court here is entirely of a different opinion.   Even the holders of negotiable securities, taken in the usual course of business, before the securities fall due, are held chargeable with notice, where the marks on the instrument are of a character to apprise one to whom the same is offered of the alleged defect.   *Goodman* v. *Simonds*, 20 How. 365.

When it is proposed to impeach the title of a holder, for value, by proof of any facts and circumstances outside of the written instrument itself, it is a very different matter.   He is then to be affected, if at all, by what has occurred between other parties; and he may well claim an exemption from any consequences flowing from their acts, unless it be first shown that he had *knowledge* of such facts and circumstances at the time the transfer was made.   These principles are of universal application; but where a person takes a negotiable security, which,

upon the face of it, is dishonored, he cannot, says Taney, C. J., be allowed to claim the privileges which belong to a *bona fide* holder. *Andrews* v. *Pond*, 13 Pet. 65.

If he chooses to receive it under such circumstances, he takes it with all the infirmities belonging to it, and is in no better condition than the person from whom he received it. The same doctrine was enforced and applied in a subsequent case, where, in speaking of a promissory note, so marked as to show for whose benefit it was to be discounted, the court held that all those dealing in paper "with such marks on its face must be presumed to have *knowledge* of what it imported." *Fowler* v. *Brently*, 14 Pet. 318; *Brown* v. *Davis*, 3 Term, 80.

Actual notice in such a case is not required, even in suits founded upon negotiable securities, where the evidence of its infirmity consists of matters apparent on its face; nor is any different or stricter rule applicable in cases like the present, it appearing that the printed words, though erased so as to be inoperative, were still entirely legible, even to the casual reader; and that the words " current funds," inserted before the erased word " drafts," were plainly repugnant to the erased words, " drafts· to the order of," which followed them in the same connection.

Constructive notice in such cases is held sufficient, upon the ground, that, when a party is about to perform an act which he has reason to believe may affect the rights of third persons, an inquiry as to the facts is a moral duty, and diligence an act of justice. Whatever fairly puts a party upon inquiry in such a case is sufficient notice in equity, where the means of knowledge are at hand; and if the party, under such circumstances, omits to inquire, and proceeds to do the act, he does so at his peril, as he is then chargeable with all the facts which by a proper inquiry he might have ascertained. *Hawley* v. *Cramer*, 4 Cow. 712; *Hill* v. *Simpson*, 7 Ves. Jr. 170; *Kennedy* v. *Green*, 3 Myl. & K. 722; *Booth* v. *Barnum*, 9 Conn. 286; *Pitney* v. *Leonard*, 1 Paige, 461; *Pringle* v. *Phillips*, 5 Sand. 157.

Authorities to show that the material alteration of a written instrument renders it void is unnecessary, as it is a principle of universal application.

*Decree reversed, and the cause remanded, with direction to enter a decree in favor of the complainant.*