FIRST NATIONAL BANK OF FORT DODGE, Appellant, v. J. H. McCARTAN et al., Appellees.

APRIL 5, 1927.

OPINION ON REHEARING JUNE 26, 1928.

*Kelleher & Mitchell,* for appellant.

*Heald, Cook & Heald* and *F. P. Hogan,* for appellees.

KINDIG, J.—A rehearing was granted in this cause. Consequently, this is the second opinion. For the first decision, see 213 N. W. 408.

There is no doubt that J. H. McCartan (now deceased) and R. B. McCartan were accommodation makers of the note. The facts and circumstances are:

Two banks, the First National and the McCartan State, both of Pocahontas, were operated as associate concerns. One C. B. McCartan, his mother, Ella, and brother, Theodore, owned much of the stock of each. C. B. McCartan was cashier of the latter institution. Those makers of the note above named were the uncles of C. B. Perhaps because of that relationship, and the further fact that J. H. and R. B. had previously aided him and his mother financially, C. B. approached them for monetary assistance, under the following conditions: Through the voluntary action of the stockholders, an assessment approximating 100 per cent had been levied against the stock of each bank. Therefore, on Sunday, August 8, 1923, C. B. McCartan journeyed to his uncles' farm, and requested them to sign an accommodation note for $7,500, to accomplish which a blank form was left; and on Monday morning, in compliance with the nephew's entreaty, J. H. and R. B. affixed their names thereto, without filling any of the blanks, and placed the same in the mail, ad-

1038

dressed to C. B., unaccompanied by any letter of instructions. Upon receipt thereof, the addressee completed the "note" by writing in the proper places the amount and date of maturity, which were "$7,500" and "one year," respectively. That was unobjectionable, and about it no complaint is made.

In addition, however, C. B. also, in the appropriate space, inserted his own name as payee. About this the controversy centers, and will be hereafter discussed. Subsequently, and within a brief time, C. B. McCartan sold the "note" to the McCartan State Bank, and placed the proceeds thereof to his own credit in the same institution. Then he immediately proceeded to apply the entire sum in payment of the "assessment" made against the stock which he, his mother, and brother held.

Next in the course of events was the negotiation of this "note" by the McCartan State Bank for full value to the appellant. When suit was brought, appellees defended upon the ground that the "note" was nonnegotiable, and therefore subject to any defense which the "makers" might have against C. B. McCartan,—which plea is that the understanding and agreement between J. H., R. B., and C. B. McCartan were to the effect that the signers of the "note" were to so become for the "accommodation" of the "bank" only, and not for C. B. McCartan, as he himself by unauthorized insertion made it appear. No claim is interposed as to which of the two banks it is, to which reference is there made.

Appellant urges two propositions on this appeal.

I. Does the following acceleration clause destroy the negotiability?

"It is also agreed that should the holders of this note at any time deem themselves insecure, they may demand such additional security as may seem to them necessary, a failure to comply with such demand causing this note to become due and payable at once."

Attempt at reconciliation between conflicting views of the judicial decisions on this point in the various states is not necessary, for the reason that this court has previously taken a definite stand. *Iowa Nat. Bank v. Carter,* 144 Iowa 715; *Quinn v. Bane,* 182 Iowa 843. *Iowa Nat. Bank v. Carter,* supra, contains the ensuing appropriate discussion:

"It is fundamental, of course, that to make a note negotiable it must be certain both as to time and amount of payment. * * * 'An instrument payable upon a contingency is not negotiable, and the happening of the event does not cure the defect.' Before the adoption of the Negotiable Instruments Law, we had held that these provisions [acceleration clauses] in a note and mortgage rendered it nonnegotiable. * * * Since the general adoption of the Negotiable Instruments Act, the courts have held to the same doctrine. * * *"

*State Bank of Halstad v. Bilstad,* 162 Iowa 433, does not modify the *Carter* case, for, as shown by 144 N. W. 363, there was removed from the *Bilstad* case the following sentence:

"So far as the *Carter* case holds the notes therein considered nonnegotiable because of uncertainty as to time of payment, it should be modified, because the statute expressly makes notes payable on or before a fixed date negotiable."

Inconsistency does not appear in *Des Moines Sav. Bank v. Arthur,* 163 Iowa 205. Involved in that decision was an "acceleration clause" in a mortgage, rather than in the "note," and the argument was that the language of that contract of security modified and influenced the written promise to pay, to the extent that it removed its "negotiability." We there said:

"The note was complete in itself * * *. The purpose of the mortgage was to afford security for the payment of the note * * *. While the note and mortgage are to be construed together whenever the nature of the transaction becomes material, this does not mean that the provisions of the mortgage are thereby incorporated into and become part of the note."

Accordingly, it appears that there had been no modification or abridgment of the doctrine announced by the *Carter* case. No incompatibility arises between that case and the following decisions: *Des Moines Sav. Bank v. Arthur,* supra; *Commercial Sav. Bank v. Schaffer,* 190 Iowa 1088; *Hubbard v. Wallace Co.,* 201 Iowa 1143. Of course, the default of the maker in the payment of interest or the performance of some other agreement or covenant may accelerate the "due date," and in this event the instrument will still be negotiable, provided that it is payable upon a fixed or determinable future date; for under those circum-

stances "it [is] certain that the time [will] arrive when the note would be payable, and the circumstances that it might become payable before that time upon the default of the maker in certain respects at the option of the payee or holder [would] not affect its negotiability." *Commercial Sav. Bank v. Schaffer,* supra.

The criterion is, Does the election of the payee or holder to declare the paper due and payable independent of any fault and beyond the control of the maker render the contract nonnegotiable? *Des Moines Sav. Bank v. Arthur,* supra, aptly explains:

"* * * but the chattel mortgage securing the note there [*Iowa Nat. Bank v. Carter,* supra] held nonnegotiable provided that the note should become due and payable at the election of the payee or holder. This, being independent of any default of the maker, left him without protection, and such a clause is generally held to render the note, when construed in connection with the mortgage, nonnegotiable, as was decided in the above case."

Reference in the *Arthur* case was made to the following clause contained in the instrument in *Iowa Nat. Bank v. Carter,* supra:

" '* * * or if at any time the said party of the second part * * * shall deem themselves insecure, then the whole amount of said sum of money in said notes mentioned which shall not have been paid, * * * shall be immediately due and payable.' "

Inspecting now the phraseology of the paragraph involved in the case at bar, it is found that the undertaking was:

"It is also agreed that should the holder of this note at any time deem themselves insecure," etc.

Basis for this attitude is not the default of the maker, for he has no control over the "holder's" feeling in this regard, but rather, the option contemplated may arise at any time the whim or caprice of the "holder" so elects. Then, after the exercise of that option, "they [the holders] may demand such additional security as may seem to them necessary, a failure to comply with such demand causing this note to become due and payable at once." In other words, the "maker" is not in default in the

first instance, and only becomes in that predicament through an election by the "holder" over which no one has any control except the elector himself. Presented here is a different situation from that which arises, causing "acceleration" because the "maker" fails to perform some duty, and for that reason is in default. Under the illustration, the "due date" is "advanced" because of the "maker's" failure; while in the actual case before us, the "advancement" was attempted, not because of the "maker's" omission, but due to the mere volition of the "holder." Applying the general principles to the facts here, it is found that the clause contained in the "note" puts it in the power of the "holder," if he so desires, to render it due at any time, regardless of anything the "maker" may do. Therefore, the maturity date is uncertain, and nonnegotiability results. *Iowa Nat. Bank v. Carter,* supra, and *Des Moines Sav. Bank v. Arthur,* supra.

II. With that legal principle established, the next consecutive step in the solution of the problem before us would be a consideration of the facts as to whether or not "the blank instrument" was completed erroneously, or in violation of instructions. However, this case was tried below to the court, for the jury was waived. Conflicting evidence appears in the record, and because of this we are bound by that tribunal's finding of fact, which was to the effect that the intention of J. H. and R. B. McCartan was to accommodate "the bank," rather than C. B. McCartan.

III. Resultantly, we are limited in our further review to a legal question growing out of appellant's assertion of an estoppel against the appellees, due to their negligence and conduct in the premises in permitting C. B. McCartan to receive the incomplete instrument to be by him filled and used in commerce. Appellant knew nothing of the alleged fraud or limited authority, when the purchase was made.

Replying to this legal theory, appellees cite Section 9451 of the 1924 Code as the reason for its inapplicability. Referring to that enactment, we find the following language:

"Bonds, duebills, and all instruments by which the maker

promises to pay another, without words of negotiability, a sum of money * * * are assignable by indorsement thereon, or by other writing, and the assignee shall have a right of action thereon in his own name, subject to any defense or counterclaim which the maker or debtor had against any assignor thereof before notice of such assignment.''

Reservation of ''any defense or counterclaim'' in the paragraph quoted, does not render the principle of ''estoppel'' inadaptable or incapable of application to the subject-matter under examination. Existing equities, ''defenses, or counterclaims'' can, in the premises, be asserted, except where the possessor thereof is by his own acts ''estopped.'' Such is no different from the situation prevailing wherever one is prevented from enjoying a right which he otherwise would have, were it not for the fact that, under existing circumstances, he cannot do so, for the reason that he has ''estopped'' himself. *Farmers Nat. Bank v. Stanton,* 191 Iowa 433.

Stating the thought in another way, the law concerning the assignment of nonnegotiable instruments is hereby in no way modified or abridged, for it exists in its full scope and effect; but rather, appellees by their own conduct have lifted themselves out of the protecting sphere of said statute over into the zone of ''estoppel.'' Appellees, in support of their contentions in this regard, cite *Farmers Nat. Bank v. Stanton,* supra; *Farmers Sav. Bank v. Van Brunt Auto. Co.,* 193 Iowa 217; and *First Nat. Bank v. Galloway Bros. & Co.,* 193 Iowa 1145. Careful analysis of those cases will reveal the fact that they are not in point.

*Farmers Nat. Bank v. Stanton,* supra, indulges in this philosophy:

''Every man executing a nonnegotiable note does it, knowing it may be sold or disposed of to another, and every person buying such paper knows he takes it subject to every defense which would have been available to the maker, had it not been negotiated. He owes the world no duty to stand on guard and publish warning to others that he preserves the right to defend against its collection by a transferee, if it shall happen that there is ground for such defense. The note itself carries such warning on its face.''

Nevertheless, the objection to payment there was fraud and

false representations concerning the financial standing and condition of a certain corporation. Manifestly, there was no "estoppel" in such event, because the makers of that note were in no way to blame. They were imposed upon by misrepresentations. Quite different is the position of the appellees in the case before us, for here they negligently permitted the "paper" to leave their hands in an incompleted condition, and put it within the power of C. B. McCartan to supply the omitted portions and start the "note" on its course through the world of commerce.

So, too, *Farmers Sav. Bank v. Van Brunt Auto. Co.*, supra, had to do with procurement by fraud; and it was there said that a counterclaim, therefore, could be asserted against the transferee of a nonnegotiable "note," "in the absence of plea and proof of some fact or facts constituting an estoppel." Implication is that "estoppel" would change the result.

Also, *First Nat. Bank v. Galloway Bros. & Co.*, supra, embodied the principle of *ultra vires,* as applied to a corporation's right to become an accommodation indorser. "Estoppel" was denied because the corporate body received no benefit from the transaction, and therefore was not barred from making the plea. Clearly, that is different from the situation surrounding the McCartans' transaction; for here the "estoppel" is based upon negligence, or on the equitable principle that, where one of two innocent parties must suffer, the one whose agent brought about the loss must bear it.

IV. But it is said that, if "estoppel" is permitted, it will place appellant in the same position in which it would have been, had the instrument been negotiable, rather than nonnegotiable. If that is true, it is merely a coincidence. The right to complete a "negotiable instrument" exists, on the one hand, under and due to "the Negotiable Instrument Law," and the innocent holder is protected because he received the instrument for value before maturity as a holder in due course; while here, on the other hand, the transferee is to be guarded and shielded in his position, if at all, because there exists the "estoppel" herein defined.

V. Many authorities have dealt with the perplexing intricacies of the specific doctrine here concerned. Study of some thereof is now appropriate, as well as enlightening.

*Taylor County v. King,* 73 Iowa 153, doubts the ruling in Daniels *v. Gower,* 54 Iowa 319, and approves the following:

" 'A bond perfect upon its face, apparently duly executed by all whose names appear therein, purporting to be signed, sealed, and delivered by the several obligors, and actually delivered by the principal without stipulation, reservation, or condition, cannot be avoided by the sureties upon the ground that they signed it upon the condition that it should not be delivered unless it should be executed by other persons who did not execute it, when it appears that the obligee had no notice of such condition, and nothing to put him upon inquiry as to the manner of its execution, and also that he has been induced upon the faith of such bond to act to his own prejudice.' ''

*Benton County Sav. Bank v. Boddicker,* 105 Iowa 548, definitely overruled *Daniels v. Gower,* supra, and made use of these words:

"We cannot, however, assent to the claim of the defendants that, if the bond in suit was delivered in violation of an agreement to the effect that it should not be delivered until three additional sureties should sign it, no recovery can be had thereon, even though the plaintiff took it without knowledge or notice of the agreement. * * * In this case, if the testimony for the plaintiff be credible, the defendants executed what purported to be a valid bond, complete excepting that the names of the sureties were not inserted, and intrusted it to the principal. He delivered it wrongfully, it is said, but the plaintiff had no knowledge of that fact, nor of any circumstances which should have caused it to inquire as to the condition on which the bond was signed. We do not think that, in the absence of such knowledge, the plaintiff refrained at its peril from making inquiry as to the signing of the bond. It is a rule of general application that, when one of two innocent parties must suffer loss, it should fall upon the one whose acts caused it."

*Sawyer v. Campbell,* 107 Iowa 397, concludes:

"But it is claimed that she [the holder] was charged with knowledge of the conditions on which the note was signed, and cannot rely upon her ignorance of them; and *Daniels v. Gower,* 54 Iowa 319, and other cases, are cited in support of that claim.

We had occasion to examine the question thus presented in the recent case of *Bank v. Boddicker*, 105 Iowa 549, and reached the conclusion that the doctrine of *Daniels v. Gower*, for which the appellants contend, was erroneous, and overruled it. Following the rule last announced, we must hold that the jury would not have been authorized to find that the plaintiff took the note in suit with knowledge of the conditions [contingencies upon which instrument was signed and delivered] alleged, and that they are without effect as against her.''

*Rawleigh Medical Co. v. Bane*, 181 Iowa 734, embraced these facts and conclusions:

''Two defenses were pleaded by defendants, which were submitted to the jury as follows: (a) That said defendants signed the guaranty upon the understanding and agreement with Eustick that he was not to deliver the same to plaintiff until he had procured a third party to sign the same as guarantor, and that the said Eustick, without knowledge or notice on the part of the defendants, delivered the same to plaintiff without first having obtained another signature thereto. * * * The same appears to be ruled by *Benton County Sav. Bank v. Boddicker*, 105 Iowa 548, and *Merchants' National Bank v. Cressey*, 164 Iowa 721, and probably other cases of like tenor.''

*Tutt v. Smith*, 201 Iowa 107, embodies this phraseology:

''The doctrine is generally stated that, where an instrument held as an escrow is delivered by the depositary to the grantee without performance of the conditions upon which it was to be delivered, no title passes, and a subsequent purchaser from the grantee without notice and for a valuable consideration acquires no title, and will not be protected. *Haven v. Kramer*, 41 Iowa 382; 21 Corpus Juris 885. The rule has been strictly applied where the deed was surreptitiously and fraudulently obtained by the grantee from the depositary without his consent; and it has been said that a deed so obtained will no more pass title to the grantee than if it were a forgery, and will not transfer title to a subsequent purchaser without notice. *Jackson v. Lynn*, 94 Iowa 151. This court has, however, long recognized the rule that, *where a deed is placed in the hands of the agent of the grantor* [the italics are ours], to be delivered only on the per-

formance by the grantee of some condition, or to be deposited with another as an escrow, to be so delivered, and through the fraud of such agent the deed is delivered to the grantee, a purchaser for value and without notice from the grantee will be protected, upon the familiar doctrine that, as between two parties both of whom have been wronged, the one least at fault will be protected. And this is true although, as between the original grantor and grantee, there was no delivery.''

*Angle v. North-Western Mut. Life Ins. Co.,* 92 U. S. 330, announces:

'' * * * and the rule is that, as between such party [the maker] and innocent third parties, the person to whom the instrument was so intrusted must be deemed the agent of the party who committed the instrument to his custody, in filling the blanks necessary to perfect the instrument. * * * Questions of the kind most frequently arise in respect to negotiable instruments, but the court here is of the opinion that the same rule is properly applicable to the case before the court. Authority to act for another may be express, or it may, in certain cases, be implied; but an implied authority has its limitations, as well as that which is express. Examples to prove that proposition exist everywhere; but it would be difficult to give one more apposite and striking than the one presented by the case in decision, where the authority to fill blanks is implied from their existence in an instrument intrusted to another for use.''

*Bank of Pittsburgh v. Neal,* 22 How. (U. S.) 96, states:

'' * * * as between such party and innocent third parties, the person to whom it was so intrusted must be deemed the agent of the party who committed such instrument to his custody—or, in other words, it is the act of the principal, and he is bound by it. * *. * In view of all the facts, as disclosed in the pleadings, we think the case clearly falls within the operation of the rule generally applicable in cases of agency, that, where one of two innocent parties must suffer through the fraud or negligence of a third party, the loss shall fall upon him who gave the credit.''

*Gronvold v. Federal Union Sur. Co.,* 129 C. C. A. 428 (212 Fed. 908), aptly says:

"It is a settled and salutary rule of law that a maker who through confidence intrusts, or through culpable negligence permits to go, to the custody of a third party a blank bond or promissory note, or other like instrument, which the third party completes by filling the blanks, and then delivers, for a purpose within the general scope and design of the instrument, to an innocent obligee or purchaser, who is thereby induced to change his situation to his legal injury, in reliance upon the completed instrument, is thereby estopped, as against such obligee or purchaser, from denying that he executed and delivered the completed instrument to the obligee or purchaser."

*Title Guar. & Sur. Co. v. Schmidt*, 129 C. C. A. 543 (213 Fed. 199), contains the statement:

" 'It must be conceded that courts of justice, if in their power to do so, should not allow a party who, by act or admission, has induced another with whom he was contracting to pursue a line of conduct injurious to his interests, to deny the act or retract the admission in case of apprehended loss.' "

*Johnston Harv. Co. v. McLean*, 57 Wis. 258 (15 N. W. 177), summarizes:

"* * * having authority to fill the blank in the note with the particular sum agreed upon, his afterwards filling it with a different sum was not a forgery of the note, but a breach of his duty as the agent of the appellant, for which his principal must suffer, rather than an honest holder of the note. Having executed the note in blank as to the amount, with the intention that the blank should be filled before being negotiated by the person in whose possession he placed it, after signature, third persons dealing with the person in possession have the right to presume that the authority to fill the blank was a general, and not a special, authority, and they are not bound by any private instructions as to the amount which should be inserted in the note. * * * If it be admitted that the note sued is not negotiable, still the rule is the same as to the liability of the person signing the same in blank. * * * and as to third persons, having no knowledge of the limitations of the agency, the law presumes the agency a general one for that purpose."

See, also, *Watkins Co. v. Keeney*, 52 N. D. 280 (201 N. W.

833). *Johnston v. Hoover*, 139 Iowa 143, in discussing the Negotiable Instrument Law, sums up in this way:

"And to complete the instrument means no more than to fill in the blanks left for the insertion of such matters. This conclusion is at one with the view generally taken by the courts in those jurisdictions where the rule of the common law on the subject of filling blanks is in accord with the provision of the Negotiable Instruments Law. And, as it would seem, there the rule—as regards a good-faith holder in due course—is based, not only on the doctrine of implied authority, but upon the principle of estoppel."

*Newsome v. Harrell*, 146 Ga. 139 (90 S. E. 855), asserts:

"He [the grantor] directed his son to act for him; and if the result of this was that one of two innocent persons must suffer, he who puts it in the power of the third person to inflict the injury must bear the loss. * * * Harrell caused his son to execute the written instrument, and to deliver it to Newsome; and Newsome, having acted upon it, cannot be made to suffer on account of the negligence of Harrell in failing to read the instrument before sending it, or on account of the wrongful conduct of the scrivener in failing to write it as instructed."

*Carstensen & Anson Co. v. Wright*, 25 Ida. 492 (138 Pac. 830), makes this pronouncement:

"The rule of law governing such transaction [those involving nonnegotiable paper] as to the dealing with a holder of the legal title by an innocent purchaser is that, where the owner of a nonnegotiable instrument clothes another person with the apparent legal title to the instrument, such person so clothed with the apparent legal title may sell and dispose of the instrument to an innocent person, for value, without notice of the rights of the real owner, in the same manner as though he were the real owner. [There was involved a statute to the effect that assignments of nonnegotiable paper were subject to equities and defenses.]"

Continuing, the court quoted with approval from *McNeil v. Tenth Nat. Bank*, 46 N. Y. 325:

" 'The rights of innocent third parties,' as the court there observes, 'do not depend upon the actual title or authority of the

party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance.' ''

2 Corpus Juris 1243, Section 120, supplies this text:

''If a party to an instrument intrusts it to another for use, with blanks not filled, such instrument so delivered carries on its face an implied authority to fill up the blanks necessary to perfect the same with matter in general conformity to the character of the instrument; and, as between such party and innocent third persons, the person to whom the instrument is so intrusted must be deemed the agent of the party who committed the instrument to his custody. * * * While the most common application of this rule arises with reference to the filling of blanks in bills and notes, it is not confined to such instruments, but is also applicable to all simple contracts in writing, and, in some jurisdictions, to sealed instruments.''

21 Corpus Juris 1169, Section 175, declares:

''A recognized proposition as to estoppel *in pais* is that if, in the transaction itself which is in dispute, a party has led another into the belief of a certain state of facts by conduct of culpable negligence calculated to have that result, and such culpable negligence has been the proximate cause of leading, and has led, the other to act by mistake upon such belief to his prejudice, he cannot be heard afterward, as against that other, to show that the state of facts referred to did not exist. Since, in order to create an equitable estoppel, it is not necessary that there should be an intentional moral wrong * * *.''

8 Corpus Juris 391, Section 577, consistently suggests:

''Nonnegotiable paper is subject to defenses existing against the payee, without regard to how it is transferred, unless the maker is estopped to set up his defense, or the right to insist on equities has been waived.''

Thus it seems certain that the courts and text-writers everywhere have recognized the undoubted law that ''estoppel,'' when the facts give rise to it, can be applied to the maker of a non-

negotiable "note;" and this is true without trespassing upon the limits of the Negotiable Instrument Law, or in any way undermining or making infirm or inapplicable Section 9451, supra, relating to "counterclaims and defenses." To continue the idea, it will perhaps lend to clearness if it be further said that the boundaries of the principles involved are well-marked, and the one ends where the other begins.

VI. In considering this question, there must be clearly kept in mind those principles of law relating to the delivery of contracts and papers for the purpose of safe-keeping, or some other object, rather than and different from transfer through the commercial world. Too, there is to be remembered the distinguishing features between the facts involved in the case at bar and those relating to the filling of blanks in or placing of signatures upon papers not authorized or intended to be completed or signed as valid instruments for any purpose, under any condition. Illustration of these thoughts can be found in *First Nat. Bank v. Zeims,* 93 Iowa 140; *People's Tr. Co. v. Smith,* 215 N. Y. 488 (109 N. E. 561); and *Scollans v. Rollins,* 179 Mass. 346 (60 N. E. 983).

*First Nat. Bank v. Zeims,* supra, relates to a situation where the signer of the blank paper placed his signature thereon for the purpose of identification only. Under those circumstances, the court there said:

"It is apparent from this testimony, if it be believed, that defendant did not intend to execute a note or contract of any kind, and that he did not, either expressly or impliedly, authorize Clark to fill up the note or use the paper and signature otherwise than as a means of identification. Under such a state of facts, we think it quite clear that the filling of the blanks in the note was wholly unauthorized, that the instrument is a forgery, and that plaintiff, though an innocent holder, cannot recover thereon. No doubt, if one signs a blank promissory note, and intrusts it to another, whether it be to accommodate him to whom it is intrusted or to be used for his own benefit, such instrument carries on its face an implied authority to fill up the blanks and perfect the instrument. Or if one should execute a commercial instrument in blank, and deliver it to an agent to be filled up in accordance with certain specific directions, and this

agent should fill them up for larger amounts, or on different terms, the maker would be bound by the instrument as filed, if it should come into the hands of a bona-fide holder on account of having reposed trust in the agent. But in each of these cases it is the intent of the signer that the paper shall become operative as a promissory note or other contract. In one case, he has given the holder implied authority to fill up the note, and in the other has given express authority, which has been exceeded. *There is a sharp distinction between cases where the signer of the paper executes an instrument intending it to be a contract in some form, and where he merely signs a paper to furnish the means of identification.* [The italics are ours]."

*People's Tr. Co. v. Smith,* supra, thus serves to elucidate the point:

"The defendants Smith delivered to the defendant George F. Stainton, described in the record as George F. Stainton, No. 1, a bond and mortgage to secure a debt of $3,000. The mortgagee had a nephew of the same name, who is a member of the bar. He is described in the record as George F. Stainton, No. 2. The uncle placed the bond and mortgage, with other papers, in a separate bundle, and left them, solely for safe-keeping, in the safe in his nephew's office. The nephew purloined the bond and mortgage, and attempted to assign them to the plaintiff, the People's Trust Company. He executed, in his own handwriting, a document in the form of an assignment, and on that security obtained from the plaintiff a loan of $2,000. * * * The bond and mortgage were delivered to the plaintiff, together with the assignment. Stainton No. 1 had no knowledge of the transaction. His good faith is conceded. * * * The bond and mortgage were not accompanied by any blank form of transfer, signed by the true owner. There was nothing about them to indicate that any transfer was contemplated. They were the expression of a static condition, of a 'right at rest,' rather than a 'right in motion.' The bond and mortgage were not delivered to the agent to be dealt with or disposed of; they were delivered for safe-keeping. They were not delivered in a form which involved a representation to the public that any transfer was in view. A transfer was not invited; it was not authorized; and it could be accomplished only through a crime. * * * There is little analogy between a

commercial document with an indorsement which, by commercial usage, is an invitation to purchase it, and a bond and mortgage unaccompanied by any instrument of transfer.''

In *Scollans v. Rollins,* supra, after suggesting that the owner of commercial paper, stocks, or bonds is not liable, first, for their unauthorized circulation by a thief, or second, for the wrongful conversion thereof by a pledgee, when the transaction did not contemplate the transfer or use of the instruments by the bailee in the commercial world, then the court continued with this approval of the general doctrine:

''But if the owner of the instrument intrusts it to another [with blanks serving as an invitation to him to fill them and transfer to others for a consideration], he does so charged with notice of the power to deceive which he is putting into that other's hands, and if deception follows, he must bear the burden.''

VII. Having, in the way previously explained, armed C. B. McCartan with the incompleted document, intending that he should perfect it to the extent that the same would appear full and regular upon its face, thereby J. H. and R. B. McCartan constituted their nephew, through implication, if not directly, their agent for this purpose, knowing and intending that the ultimate resulting and regular-appearing instrument should be used to cause some innocent man or institution to part with valuable consideration. As could be foreseen and reasonably expected from the conduct just described, the very situation is presented where someone must suffer. He, therefore, who made this possible, under the circumstances, must bear the brunt of it. And now, when there must be loss, it should fall upon those who, by negligence or lack of care, made it free to happen, or likely to occur; and in the premises, said principals must be bound by the acts of their agents, committed under the authority thus extended.

The judgment of the district court should be, and hereby is, reversed.—*Reversed.*

DE GRAFF, ALBERT, and WAGNER, JJ., concur.

EVANS and MORLING, JJ., specially concur.

STEVENS, C. J., concurs in result.

FAVILLE, J., took no part.

EVANS, J. (specially concurring).—I. I concur in the reversing result reached in this case by the majority opinion. I do not, however, agree to the ground upon which it is predicated. I am fully persuaded that the finding of the district court to the effect that C. B. McCartan breached his authority in the manner of filling the blank note had no legal support in the evidence. I would reverse on this ground. The conversation between C. B. and J. H. McCartan upon which the breach of authority was predicated was a very brief one, and was had between these two alone, in a short walk from house to barn. Nothing was said in such conversation as to who should be payee of the note, nor how it should be negotiated. Furthermore, nothing was said to indicate that the McCartans were to sign a *blank* note. C. B. McCartan left J. H. McCartan a blank note, presumptively to be filled and signed on the following day (Monday). The amount of it was to be $7,500. No other feature of the note was mentioned in the conversation. R. B. McCartan was not present at the conversation. Instead of filling out the blank note on Monday morning, the McCartans signed the blank form, without filling any blanks therein, and mailed the same to C. B. McCartan, without any letter or advice whatever.

It is true that J. H. McCartan contended, as a witness, that the note was to be "for the bank." But, being fully interrogated as to the very conversation, he repeated the same a number of times. The detailed conversation repeatedly stated by him wholly failed to support his contention. His contention was wholly argumentative, and was a mere declaration of his own intention or understanding.

I confess that, upon my first consideration of the record, I was of opinion that a sufficient conflict was presented to forbid our interfering with the finding of fact. A more careful analysis of the evidence, however, has fully persuaded me to the contrary.

II. Division III of the majority opinion predicates reversal upon the theory that the defendants are estopped to question the authority of C. B. McCartan in filling out the blank spaces as he did. I am unable to agree with the doctrine therein set forth, in

view of the fact that the instrument sued on was nonnegotiable, as held in Division I of the opinion. The doctrine is predicated largely upon the authority of *Angle v. North-Western Mut. Life Ins. Co.,* 92 U. S. 330, and upon *Bank of Pittsburgh v. Neal,* 22 How. (U. S.) 96. The holding of the United States Supreme Court in the two cited cases was, in substance, that, where a party puts a blank note in the possession of another, to be filled, it will be *conclusively* presumed that the authority was as broad as the actual exercise of agency by the agent. Such a *conclusive* presumption would necessarily operate in favor of a holder of nonnegotiable paper, as well as of a holder of negotiable paper.

My contention is that this doctrine has been wholly superseded by Section 9474 (Code of 1924) of our Negotiable Instrument Law. This section is as follows:

"Where the instrument is wanting in any material particular, the person in possession thereof has a prima-facie authority to complete it by filling up the blanks therein. And a signature on a blank paper delivered by the person making the signature in order that the paper may be converted into a negotiable instrument operates as a prima-facie authority to fill it up as such for any amount. *In order, however, that any such instrument when completed may be enforced against any person who became a party thereto prior to its completion, it must be filled up strictly in accordance with the authority given and within a reasonable time.* But if any such instrument, after completion, is negotiated to a holder in due course, it is valid and effectual for all purposes in his hands, and he may enforce it as if it had been filled up strictly in accordance with the authority given and within a reasonable time." (The italics are mine.)

It will be observed from a reading of this section that the authority of the "person in possession" to fill blanks is prima-facie only, *except as to the holder in due course of a negotiable instrument.*

As to a holder in due course of negotiable paper, the maker is *conclusively* bound by the act of the "person in possession." In all other cases, the maker may challenge the authority of the agent. If this be not the meaning of this section, then it performs no function whatever. I would hold, therefore, pursuant to the express terms of this section, that the maker did have a

right to challenge the scope of the authority of the "person in possession" of his blank note, *unless it had been negotiated to a holder in due course.*

The answer of the majority opinion to this contention is that the maker would have such right except that he had estopped himself. The infirmity of this contention is that the very estoppel contended for is the mere fact that the maker had a defense to the note. If such contention be sound in this case, it would be equally sound in every case where a nonnegotiable note had been sold for full consideration to a purchaser without notice of any defense.

The trap, if any, into which the innocent purchaser in such a case falls, is precisely the same kind as that into which this plaintiff fell. If, on the one hand, it may be said that the plaintiff herein had a right to believe that the note purchased by it, though nonnegotiable, was, nevertheless, valid and collectible, yet, on the other hand, it may as properly be said that the makers of this note, when they signed it in blank, had a right to believe that they would be protected against any unauthorized act of the "person in possession" by the nonnegotiability of the note; and they had a right to believe that no person would buy a nonnegotiable note without inquiry. In such a case, the makers acted strictly within their legal rights; whereas the purchaser must be deemed, in law, to know that it was purchasing paper subject to defenses. Why, then, should an estoppel be deemed to arise as against the maker, who acted within the law, and in favor of the purchaser, who carelessly ignored the law? In my judgment, the doctrine of estoppel at this point was never sound, and that is doubtless the reason why it was intentionally superseded by Section 9474. The question here under consideration was forcefully discussed by us in *Farmers Nat. Bank v. Stanton,* 191 Iowa 433, wherein we said:

"Every man executing a nonnegotiable note does it knowing it may be sold or disposed of to another, and every person buying such paper knows that he takes it subject to every defense which would have been available to the maker, had it not been negotiated. He owes the world no duty to stand on guard and publish warning to others that he preserves the right to defend against its collection by a transferee, if it shall happen that

1056

there is ground for such defense. The note itself carries such warning on its face.''

But I am confronted in discussion with the contention that Section 9474 should not be deemed applicable to any other instrument than a negotiable one. To so contend is to conceive of the Negotiable Instrument Law as an independent body of law, separable from and unrelated to the great body of the law upon other subjects. This cannot be so. While this statute purports to be a complete enactment of the law relating to negotiable instruments, it by no means follows that it is separable from and unrelated to the great body of the law on other subjects. It still rests upon great general principles which permeate the larger body of the law. It cannot be carved out of such body of the law as a thing by itself. It is simply interwoven therein, and its threads are connected with legal principles which extend out into other subjects. In the codification of laws we gather into separate chapters the law relating to separate subjects. But underlying the law of every detailed subject are certain fundamental principles, which underlie many subjects and which relate the law of every subject to all the law there is. The particular propositions pertaining to particular subjects are usually predicated upon general principles which underlie many kindred subjects. These general principles are to some extent expressed, and to some extent implied, in codifying statutes. In Section 9474, the broader principle is *expressed,* and an exception is engrafted thereon in favor of a holder in due course of a negotiable instrument. The Negotiable Instrument Statute is a branch of the law of contracts, and it is inseparable from the principles underlying the law of contracts. The law of negotiable instruments is inseparable in its logic from the law of nonnegotiable instruments. To a large extent, the principles governing each run side by side. Indeed, the *primary* difference between them is that the one may be negotiated free of defense, and the other may not. In Section 9474, the first three sentences thereof lay down a broad principle of general application; whereas the next and last sentence thereof lifts a holder in due course of a negotiable instrument out of the operation of the broad principle first stated.

The principle laid down in the first three sentences is con-

tradictory to the rule adopted by the United States Supreme Court in the cited cases of 50 years ago; but the next and concluding sentence of the section adopts such former rule, so far as it applies to a holder in due course of a negotiable instrument, and not otherwise. The presumption of authority is made *conclusive* in favor of a holder in due course only. If the purchaser of a negotiable instrument should take the same in good faith, for a full consideration, and without notice, but should take his title by assignment or delivery, without indorsement, he would not be a holder in due course, and would not be entitled to the benefit of the last sentence in Section 9474.

Under the majority opinion, however, if his note so taken had been *nonnegotiable* in form, he would take the same under the same protection as is afforded to a holder in due course of a negotiable instrument under the last sentence of Section 9474. The effect of the opinion is, therefore, to put the innocent holder of a nonnegotiable note upon higher ground than the innocent holder of a negotiable note not in due course. Such holding is inconsistent with the principle enunciated in this section, and is contradictory to its logic. This holding of the majority is not made under the compulsion of any precedent in this jurisdiction. It is simply a voluntary adoption of the rule which is approved in other jurisdictions, but which is inconsistent with our own statute.

Whether Section 9474 is to be deemed controlling or not, it would seem appropriate that, in the adoption of a rule for the first time in this jurisdiction, we should seek to be consistent with such statute, rather than inconsistent. I would hold that the innocent holder of nonnegotiable paper can occupy no better ground in such a case than the innocent holder of negotiable paper who has failed to become such in due course.

The foregoing is a sufficient indication of the reasons which impel me to disagree with the ground of the holding of the majority.

Morling, J., joins in this special concurrence.